THE YALE GAS STOVE Co. *vs.* JEDEDIAH WILCOX ET UX.

JEDEDIAH WILCOX *vs.* JOHN B. FOLEY.

Third Judicial District, New Haven, January Term, 1894. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

A secret contract between the owner of property and one who undertakes to, and does, organize a joint stock company for its purchase, at a sum much larger than the owner stood ready to take, whereby it is agreed

102 FEBRUARY, 1894.

Yale Gas Stove Co. *v.* Wilcox. Wilcox *v.* Foley.

that the avails of such sale (which in this case was accomplished by the aid and influence of said parties, as stockholders and directors in said company), should be divided between them, is opposed to public policy and is illegal; and the promoter cannot maintain an action against the owner to recover the value of his alleged share of such avails.

Moreover the company, upon discovery of the fraud practised upon it, may sue and recover of such parties the secret profits obtained by them in the transaction, though no offer of rescission is made by the company, and notwithstanding the property purchased is worth as much or more than was paid for it.

The maxim that "he who comes into equity must come with clean hands," refers solely to willful misconduct in regard to the matter in litigation; not to some other transaction although indirectly connected with the subject-matter of the suit.

The word "promoter" is a business, rather than a legal, term; and sums up in a word business operations familiar to the commercial world by which a company is generally brought into existence. Such a person occupies a fiduciary relation towards the company or corporation whose organization he seeks to promote.

The law does not prohibit a promoter from dealing with his company; but if he does so he is bound to see that the transaction in all its parts is open and fair; suppression, concealment, or misrepresentation of material facts is fraud, upon proof of which rescission of the contract or repayment of the secret profits will be compelled; a promoter cannot act both as vendor and vendee, and in the latter capacity approve a transaction suggested by him in the former.

[Argued January 24th—decided February 19th, 1894.]

THE first of the above-named cases—the *Yale Gas Stove Co.* v. *Wilcox and wife*—was an action to recover damages and also for equitable relief, for fraud alleged to have been practised upon the plaintiff by the defendant, Jedediah Wilcox, in the sale of certain letters patent; brought to the Superior Court in New Haven County and tried to the court, *F. B. Hall, J.;* facts found and case reserved for the advice of this court. *Judgment advised for the plaintiff.*

The second case—*Wilcox* v. *Foley*—was an action to recover damages for the breach of a contract relating to the sale of the aforesaid letters patent; brought to the Superior Court in New Haven County and tried to the court, *F. B. Hall, J.;* facts found and case reserved for the advice of this court. *Judgment advised for the defendant.*

The two cases, which involved parts of one transaction,

were heard together in the Superior Court, and but one finding of facts was made, covering both cases. They were also argued together in this court. The finding of facts is as follows :

" In December, 1889, John B. Foley, being the owner of certain valuable patents for inventions in gas stoves, which he was desirous of disposing of, offered in a conversation with Jedediah Wilcox to sell said letters patent for the sum of $2,500. The said Wilcox, believing said letters patent to be valuable, and having had experience in the organization of joint stock companies for similar purposes, proposed to said Foley the organization by said Wilcox of a joint stock company for manufacturing gas stoves under said patents, the sale to such company of said letters patent, and a division between said Foley and Wilcox of the avails of such sale. Said Wilcox, after interviews with various persons, believing that he could organize such a joint stock company for the purpose of carrying out said plan of organizing such company to manufacture said stoves, under said patents, and of selling such letters patent to such company, and dividing between himself and Foley the avails of such sale, on the 14th day of January, 1890, entered into the following agreement with said Foley :

" This agreement, entered into this 14th day of January, 1890, by and between John B. Foley, of the town and County of New Haven, and State of Connecticut, of the first part, and Jedediah Wilcox of said town and county, of the second part, Witnesseth as follows :

" Whereas, said John B. Foley is the owner of letters patent of the United States of America, dated the 30th day of August, 1887, and numbered 368,938 for improvements in gas stoves, and he is also the inventor of a certain other improvement in gas stoves, for which he has applied for letters patent of the United States by application, filed the 14th day of November, 1889, and serial number 330,244 ;

" And whereas, said Jedediah Wilcox is desirous of owning one half part of the letters patent, and of the invention and improvements above described :

" Now, therefore, in consideration of the covenants hereinafter contained, and of one dollar, and other valuable considerations, the said Jedediah Wilcox hereby covenants and agrees with said John B. Foley, and with his heirs and assigns, that he, together with his associates, will forthwith, and within a reasonable time, organize a joint stock company, under the statute laws of the State of Connecticut, for the manufacture and sale of gas stoves, containing the improvement described, and secured by said letters patent of the United States, and to be secured.

" And said Wilcox also agrees to cause to be paid to said Foley the sum of three thousand dollars in cash upon the organization of said company, and also five thousand dollars of the capital stock of the company above described.

" Said John B. Foley, his heirs and assigns, hereby covenants and agrees with said Jedediah Wilcox, and with his heirs and assigns, that upon the execution of his covenants, herein above described, he will assign and transfer by written conveyance one half of the letters patent above described; also, one half of the invention and improvements in gas stoves, for which application for letters patent has been made, and of any letters patent which may be issued for said improvements; and also, that he will assign to said Wilcox one half of any future improvements which he may hereafter invent in gas stoves while he is associated with him in the gas stove business; and also, one half of any letters patent which may be issued to him for any of the improvements above mentioned, invented while so associated with him in said gas stove business, or any reissue thereof. ·

" Said Foley also covenants and agrees to give said Wilcox one half of the three thousand dollars cash, as soon as received, and one half of the five thousand dollars of the capital stock of said company, as he shall receive it.

" Said Jedediah Wilcox also hereby agrees. to subscribe for one thousand dollars par value of the capital stock of said proposed company, and to pay for the same as called for by the directors thereof.

" And said John B. Foley hereby agrees to take one half

of said one thousand dollars worth of stock when issued, and to pay to said Wilcox therefor one half of what said one thousand dollars worth of stock shall have cost him.

"And said John B. Foley hereby also agrees to unite with said Wilcox in the execution of all necessary papers giving to the proposed company, and to all other companies organized for similar purposes, the full right to manufacture and sell gas stoves, containing the improvements secured by all the letters patent above described, whenever so requested by said Wilcox.

"In witness whereof we have hereunto set our hands the day and year above written.

[Signed] "JOHN B. FOLEY,

"JEDEDIAH WILCOX.

"Signed and delivered in the presence of

"JULIUS TWISS."

"The said Wilcox performed the work of procuring subscribers for the stock of the contemplated company, and of organizing said company, and carrying out said plan for the sale to said company of said letters patent. It was agreed between said Wilcox and Foley that said agreement and arrangement between themselves, that said Wilcox should receive a share of the avails of the sale of said patents to said company, should be kept secret. The plan for the organization of such company, and which was stated by said Wilcox to those whom he solicited to subscribe for the stock of said company, and who became the stockholders of said company, and upon which said company was organized, was as follows:

"The capital stock of the company was to be $30,000, divided into 600 shares of $50.00 each. There were to be ten subscribers of said stock, of whom said Wilcox was to be one, each of whom was to subscribe for twenty shares, and to pay in $600 in cash. After the organization of the company the company was to purchase of Foley the said letters patent, paying him therefor $3,000 in cash, and issuing to him 400 shares of paid-up stock of the par value of $20,000, for which

said Foley was to subscribe. After having received said stock said Foley was to transfer twenty shares to each of said ten subscribers to the stock of said company, and one hundred shares to the treasurer of said company, retaining the remaining one hundred of said four hundred shares, which with said $3,000 was to constitute the purchase price of said letters patent. Thereby each subscriber by payment of $600 was to receive stock of the par value of $2,000; said Foley was to receive for his patents $8,000, $3,000 being in cash, and the remainder in paid-up stock; and there was to remain in the treasury of the company, as its working capital, $5,000 in stock and $3,000 in cash.

"Said Wilcox in soliciting subscriptions for said stock did not inform any person of said agreement between himself and Foley, or that he was to receive any of the avails of the sale of said patents, but for the purpose of inducing persons to subscribe for said stock stated to nearly all of the persons who subscribed for said stock, and who now constitute the stockholders of said company, that he, Wilcox, was putting his money into said enterprise upon precisely the same basis as the others of said subscribers; and it was with that understanding that nearly all said persons subscribed for said stock.

"Said Wilcox with nine others subscribed for said one hundred shares of said stock, each receiving ten shares, and each paying the sum of $600.

"Said Wilcox was present at the first meeting of the stockholders, and was elected temporary clerk and a director, and voted in favor of the following resolution, which was adopted:

"Whereas, John B. Foley is the owner of certain letters patent of the United States for improvements in gas stoves, issued to said John B. Foley, the one No. 368,938, granted Aug. 30th, 1887, the other No. 421,258, granted Feb. 11th, 1890, and

"Whereas, said letters patent are necessary and convenient for the purpose of this company, and are valued at the sum of twenty-three thousand dollars; and

"Whereas, the said John B. Foley is a subscriber for the

capital stock of this corporation to the amount of twenty thousand five hundred dollars: Therefore

" Voted: That the directors be and hereby are authorized and instructed to purchase said letters patent Nos. 368,938 and 421,258 from said John B. Foley for the sum of twenty-three thousand dollars, and to pay him for the same by crediting his stock account the amount of his subscription, to wit: twenty thousand dollars, and issuing to him full-paid certificates for same, and to pay him the balance of said purchase price, to wit: three thousand dollars in cash."

" On the same day at the first meeting of the directors of such corporation said Wilcox was present, and voted in favor of the following resolution which was passed:

" Voted : To purchase of John B. Foley, as authorized and instructed by vote of the stockholders passed this day, letters patent of the United States, Nos. 368,938 and 421,258, and that in payment therefor the president and secretary be instructed to issue to him stock certificates full-paid to the amount of twenty thousand dollars, and that the treasurer be instructed to pay him the sum of three thousand dollars in cash, upon receipt of proper deeds of said letters patent.

" At a meeting of the directors of the plaintiff corporation, held Feb. 24th, 1890, three days after the organization of the corporation, it was agreed between Foley and the Yale Gas Stove Company that three notes for one thousand dollars each, payable two, four, and six months from that date, should be given by the company and accepted by Foley in place of the $3,000 in cash, which it had been arranged should be paid Foley as a part of the purchase price of said letters patent.

" Said Foley was also a director of said corporation.   Said three notes were duly received by said Foley, and 400 shares of paid-up stock of said company, of the par value of $20,000, were issued to said Foley in payment of his subscription for said amount of stock.   As soon as could be conveniently arranged thereafter he transferred to each of his ten associate subscribers, including said Wilcox, twenty shares of the stock so issued to him, and also transferred to the treasurer

of the corporation one hundred shares of said stock, and between Wilcox and Foley transfers were made as provided in said agreement between them, Foley receiving ten of the twenty shares, subscribed for by Wilcox, and Wilcox receiving on or before Dec. 1st, 1890, from Foley fifty of the one hundred shares issued to Foley as a part of the purchase price of said patents.

" The first note for $1,000 was paid to said Foley, and out of the proceeds thereof, on April 30th, 1890, he paid to said Wilcox $300, which was expressed to have been received by Wilcox on " account of contract." When the second note matured, though the corporation had the funds in the bank to pay the same, and though said Foley could have had the payment of the same at once, and was requested by said company to receive payment, yet Foley declined to receive payment. His reason for so doing was his unwillingness to pay any further sum to Wilcox. Foley did not draw the payment of the second note until a few days before the 9th of October, 1890, and on the 9th of October, 1890, he paid Wilcox $500, and took from him a receipt for such sum " on account."

" Foley did not draw the payment of the third note when due, although he could then have done so, and was requested so to do by the company. Said note has never been paid, and said company having learned of said agreement between Foley and Wilcox respecting the division of the proceeds of the sale of said patents to the company, now decline to pay the same.

" Payment of said note has never been demanded by said Foley. His reason for not having demanded the same was his unwillingness to make any further payment to Wilcox.

" On the       day of        1891, Wilcox brought suit against Foley upon the said written agreement between them, the same being one of the suits in which this finding is made.

" If said agreement between Foley and Wilcox is valid there is due thereon from Foley to Wilcox the sum of $1,000.

" After said suit was brought the terms of the written agreement between Wilcox and Foley first became known to

FEBRUARY, 1894. 109

Yale Gas Stove Co. *v.* Wilcox.   Wilcox *v.* Foley.

the directors of the Yale Gas Stove Company, whereupon said company, having been advised that said agreement between Wilcox and Foley was illegal and void, instituted their action against said Wilcox, which is one of the cases in which this finding is made.

" Of the eighty shares of stock so received by said Wilcox five shares had been transferred by him to one Starr before the commencement of said suits, fifty-five of said shares stand in the name of Henrietta B. Wilcox, and twenty are owned by said Wilcox.   Of the 55 shares owned by Henrietta B. Wilcox twenty shares were the shares originally subscribed for by Wilcox in his own name.   He in fact acted at the request of his wife and as her agent in making such subscription, and the $600 paid for said stock was the money of said Henrietta B. Wilcox ; said twenty shares were issued to said Wilcox as trustee.   Twenty shares were afterwards at the request of Wilcox transferred to her by said Foley as bonus upon said subscription.   The remaining fifteen of said fifty-five shares were transferred to said Henrietta B. Wilcox by her husband in consideration of an indebtedness of said Wilcox to his wife in about the sum of $800.   Said Wilcox at no time informed his wife of said agreement between himself and Foley.

" Since its formation said corporation has continued to manufacture and sell gas stoves under said patents, the business of said company has been prosperous, and said company has paid in each and every year upon its capital stock dividends ranging from 10 to 16 per cent.   I find the value of said stock to be $50.00 a share.

" Said corporation has never offered to return or transfer to either said Foley, or said Wilcox, said patents, or any part or interest therein, and has not done any act in rescission of its purchase of said inventions.

" At the request of all the parties to said causes the questions of law arising upon the same and upon said facts are reserved for the advice and consideration of the Supreme Court of Errors, next to be holden at New Haven, within and for the Third Judicial District, on the third Tuesday of

January, 1894, except that judgment is rendered in favor of Henrietta B. Wilcox in the first entitled case."

*John W. Alling,* for the Yale Gas Stove Co. and John B. Foley.

I. Two propositions are now so well established that it is hardly necessary to cite authorities in their support. 1. A director is under the obligations of a trustee, and the corporation is his *cestui que trust.* 2. Such a trustee may not make a personal profit out of his *cestui que trust,* and if he attempts so to do, and actually receives money or property as such profit, the *cestui que trust* can recover by legal action.

The proposition that a director is a trustee has been so recently decided in the case of *Mallory* v. *Mallory, Wheeler Co.,* 61 Conn., 131, as to make it unnecessary to refer to any other decision. We would call special attention to the opinion, on pages 137–142.

It is clearly well settled that a director is liable to be sued by the corporation for all profits which he may have secretly made, directly or indirectly, from dealings with the corporation. Cook on Stocks and Stockholders, §§ 649, 650 ; *Railroad Co.* v. *Kelly,* 77 Ill., 426 ; *Wardell* v. *R. R. Co.,* 103 U. S., 651 ; *Courier* v. *West Shore R. R. Co.,* 35 Hun, 355 ; *Emma Silver Mining Co.* v. *Lewis,* L. R., 4 C. P. D., 396 ; *Bank of London* v. *Tyrrell,* 5 Jur. N. S., 924 ; *McGourkey* v. *Toledo & Ohio Central R. R. Co.,* 146 U. S., 536 ; *Sargent* v. *Kansas M. R. R. Co.,* 12 Ry. Corp. L. J., 28 ; 29 Pac. Rep., 1063.

II. The case would be clear against Wilcox, even if he was not a director, because he was the promoter of this corporation. Cook on Stockholders, § 651 ; Morawetz, § 546 ; *Bagnall* v. *Carlton,* L. R., 6 Ch. Div., 371 ; *New Sombrero Phosphate Co.* v. *Ehrlanger,* 5 Ch. Div., 73 ; *Simonds* v. *Vulcan Oil & Mining Co.,* 61 Pa. St., 202. A case in point is *South Joplin Land Co.* v. *Case,* 104 Mo., 572. The promoters of a corporation stand in a confidential relation, not only to each other, but to all who may subsequently become members of the corporation, from the time they begin to promote the as-

FEBRUARY, 1894. 111

Yale Gas Stove Co. *v.* Wilcox.  Wilcox *v.* Foley.

sociation, and will be required to account for the profits made by the purchase of the property for the company, and its sale to it at an advance. *Paducah Land C. & I. Co.* v. *Mulholland*, (Ky.) Gen. Digest, 1893, vol. VIII, page 584, § 226. That no fiduciary relations existed between the corporation and its promoters, at the time the latter obtained a contract for the purchase of land, will not prevent the retention on their part of the secret profits in the sale of the land to the corporation from being fraudulent. *Mission Land & Water Co.* v. *Flash*, (Cal.) 32 Pac. Rep., 600.

III. It is understood that the claim of Wilcox is two-fold. *First.* The corporation made a good thing out of the purchase of the patents, and it does not lie in its mouth to object that he made a better thing. This claim needs no comment. *Second.* That the corporation is bound to rescind the purchase of the patents, and to offer to return the same to Foley and Wilcox. The law gives no such option to such director. The option is with the defrauded corporation. Neither Foley nor Wilcox are in any position to claim the benefit of a rescission of the contract in question. Wilcox has not offered to the corporation the profits which he attempted to make. Nor does it yet appear that Foley or Wilcox desires that the sale of the patents to the corporation should be rescinded. Wilcox having permitted the corporation to embark its capital in the business, in such a way that the rescission of the purchase of the patent is not feasible, cannot base his title to the profits of this transaction upon any such ground as that he is entitled to retain them, unless the corporation abandons its whole enterprise. Such a proposition is inconsistent with the law, which holds that a director or a promoter cannot make a secret profit out of his transactions with his corporation. *Bagnall* v. *Carlton, supra ; Whaley Bridge Printing Co.* v. *Green & Smith*, L. R., 5 Q. B. Div., 109 ; *Sydney & Wigpool Iron Ore Co.* v. *Bird*, L. R., 31 Ch. Div., 328 ; reversed, 33 Ch. Div., 85 ; *South Joplin Land Co.* v. *Case, supra ; Emma Silver Mining Co.* v. *Lewis*, 4 L. R., Com. Pleas Div., 397–409 ; *Gray* v. *Lewis*, L. R., 8 Ch. App., 1035 ; *Hersey* v. *Vesey*, 24 Me., 9.

IV. With reference to the suit of *Wilcox* v. *Foley*, it requires but little argument, and no authority to sustain the proposition that the contract between them was illegal and against good morals, and in fraud of the corporation of which both were directors and promoters.

V. The organization of the Yale Gas Stove Co. was legal. The 20 per cent required was paid in in cash. But if illegal it would not avail as a defense. *Stafford Nat. Bank* v. *Palmer*, 47 Conn., 443; *Naugatuck Water Co.* v. *Nichols*, 58 Conn., 403; Morawetz on Corporations, Vol. 2, chapters 8 & 9, *de* validity of corporate acts and illegal incorporation.

*William L. Bennett*, for Jedediah Wilcox.

I. The agreement between Foley and Wilcox was a valid contract. It was entirely proper for Foley, in consideration of the energy and experience of Wilcox, to give to his associate an interest in half his patents and half the proceeds of their sale ; and it was equally legal for them to stipulate that the patents should be sold for money and stock in a corporation to be formed to manufacture under the patents. All these provisions could be carried out without fraud and contemplate no fraud. It cannot be presumed that the contract was entered into to be performed in any other than a legal manner.

When, therefore, Mr. Wilcox began to solicit subscriptions to the stock of the new corporation he had an interest with Mr. Foley in the patents to the full extent to which the contract gave him an interest. He had in fact entered into a partnership, to which Mr. Foley contributed his patents, and Mr. Wilcox his influence and experience, the profits of which were to be divided. Neither could sell the patents for any less consideration than that fixed by their contract.

II. In making the contract, Jedediah Wilcox acted wholly for himself and stood in no fiduciary relation to the Yale Gas Stove Company, or any of its stockholders. *Gover's Case*, L. R., 20 Eq. Cas., 114 ; *Ladywell Mining Co.* v. *Brookes*, L. R., 34 Chan. Div., 398; *New Sombrero Mining Co.* v. *Erlanger*

L. R., 5 Ch. Div., 73; *Erlanger* v. *New Sombrero Mining Co.,* L. R., 3 App. Cas., 1218.

III. If it be assumed that Wilcox, as director, or while holding a fiduciary relation to the corporation, sold the patents to it without disclosing his interest therein, such sale is yet not void but is voidable only. Until rescinded by the company it is good. *Barr* v. *N. Y., L. E. & W. R. R. Co.,* 125 N. Y., 263, 277, and the cases therein referred to.

There has been no rescission of the contract of sale. The patents have proved far too valuable for such action to be thought of. This action is brought against Wilcox—Foley not being a party—to recover his, Wilcox's, profits. As the action has been brought by the company with full knowledge of the facts, they have elected to hold the patents.

IV. Inasmuch as Wilcox was acting for himself alone, and was not a fiduciary of the company at the time when he acquired his interest in the patents, there were but two courses open to the company, to wit: they could affirm the sale, or rescind it, return the patents and sue for their price. They cannot, as they are here attempting, keep the patents, and recover the consideration received by Wilcox from Foley. This question arose in the case of *In re Cape Breton Land Co.,* L. R., 29 Ch. Div., 795, and it was held that the company had no action against the agent. This case, *In re Cape Breton Land Co.,* is said by the judges to be the first in which the point directly arose, but COTTON, L. J., on page 804, refers to the opinion of Lord CAIRNS in the noted case of *Erlanger* v. *New Sombrero Phosphate Co.,* 3 App. Cas., 1234–35. The decree in this case required the return of the island with an accounting and return of the profits made in working it.

The question again came up and was directly decided in *Ladywell Mining Co* v. *Brookes,* L. R., 34 Ch. D., 398; 35 Ch. Div. 400. The principle that a voidable contract remains good until rescinded, and that, to rescind, the property obtained under the contract must be returned, is well illustrated in a case decided in the Court of Appeals, in New York, in 1891. *Barr* v. *N. Y., L. E. & W. R. R. Co.,* 125

N. Y., 263; and see also *Baird* v. *Mayor, etc.*, 96 N. Y., 567; *Grymes* v. *Sanders*, 93 U. S., 63; and the cases cited in *Tryon* v. *White & Corbin Co.*, 62 Conn., 171.

V. The Yale Gas Stove Co. does not appear in court with clean hands.

The real bargain between Foley and the Yale Gas Stove Co. fixed the price to be paid for his patents at $3,000 in cash and $5,000 in stock. But to avoid the joint stock corporation law and to defraud the public and such as might thereafter purchase their stock, the company, all the subscribers joining with Foley, made a sham contract by the terms of which it appears in the records and organization of the corporation that the value of Foley's patents was $23,000, and that the company had agreed to pay him therefor $3,000 in cash and $20,000 in paid-up stock. Under a secret agreement afterwards carried out, Foley was to return to the subscribers $10,000, and to the corporation itself $5,000 in full-paid stock. By this false valuation of the patents, one half of the capital stock appears, falsely, to have been paid up.

We submit that a court of equity finding the Yale Gas Stove Company and its subscribers to have been parties to this contract and arrangement, and that it is from the terms of this same contract and arrangement that they are here asking to be relieved, will leave them where they have placed themselves. With what propriety can the court decree that one party shall give up to the other an illegal profit while permitting that other to keep an equally illegal profit obtained in the same transaction?

The court may well permit the parties to remain as they are.

VI. The case of *Jedediah Wilcox* v. *John B. Foley* is an action brought upon the contract of Jan. 14th, 1890. This contract was fully performed by Mr. Wilcox, but has not been performed by Foley.

The contract has been performed by Wilcox. Foley's refusal to receive from the Yale Gas Company the money which they were ready and willing to pay cannot, of course, be set up in his behalf as a defense to the action.

If our contentions in the case of the *Yale Gas Stove Co.* v. *Wilcox* are sustained, there is, of course, no defense to this action.

FENN, J. Upon the facts appearing upon the record, it is claimed in behalf of Jedediah Wilcox, the defendant in the principal case, that the agreement between Foley and himself was a valid and proper contract which could be carried out without fraud, and contemplated none ; that therefore, when he began to solicit subscriptions to the stock of the new corporation, he had an interest in the patents ; that he was in fact a partner with Foley, that in making this contract with Foley he acted wholly for himself, and stood in no fiduciary relation to the Yale Gas Stove Company, or any of its stockholders. " There was," says his counsel, " no man, and no body of men, who had any hold upon him at the time he made this contract; nor any to whom he owed a duty, nor any selected, and in contemplation, to whom he might owe a duty." The objections " that a resale to some new corporation was contemplated ; that the purchase price was to be new stock of such corporation ; that but little time elapsed between the two contracts ; " are said to be " all met and answered " by the cases of *Ladywell Mining Co.* v. *Brookes*, L. R., 34 Ch. D., 398 ; and on appeal, L. R., 35 Ch. D., 400 ; *Gover's Case*, L. R., 20 Eq. Cases, 114 ; *New Sombrero Phosphate Co.* v. *Erlanger*, L. R., 5 Ch. D., 73 ; and *Erlanger* v. *New Sombrero Phosphate Co.*, L. R., 3 App. Cases, 1218.

It is further said that these cases, and also the case of *Barr* v. *New York, Lake Erie & Western Railroad Co.*, 125 New York, 263, 277, and *In re Cape Breton Co.*, L. R , 29 Ch. D., 795, are authorities for the defendant's further claim, that : " If it be assumed that Mr. Wilcox, as director, or while holding a fiduciary relation to the corporation, sold the patents to it without disclosing his interest therein, such sale is yet not void, but is voidable only," and that " but two courses are open to the company, to wit: they could affirm the sale, or rescind it, return the patents and sue for the price. They

cannot, as they are here attempting, keep the patents and recover the consideration received by Wilcox from Foley."

In the light of the above claims we will first examine the cases cited in their support, and see precisely what they hold. The principal and most recent of these English cases is that of *Ladywell Mining Co.* v. *Brookes, supra,* in which the facts were, that on February 1st, 1873, one Palin and three associates purchased a leasehold mine for £5,000, with a view of reselling it at a profit to a company to be formed. They afterwards made a provisional contract with a trustee for an intended company for £18,000 in cash. The company was formed, having for its principal object the purchase of the mine, and Palin and his associates received their purchase money of £18,000, April 4th, 1873. The contract of February 1st, 1873, was not disclosed to the company, nor did it become known to it until about June, 1883, after it had gone into voluntary liquidation. In June, 1883, the company allowed judgment by default to go against them, in an action by the lessor to recover possession of the mine. In 1884, the company commenced two actions, one against the executors of two deceased vendors, and the other against the two surviving vendors, to recover the secret profits made by the vendors on their sale to the company, on the ground that they stood in a fiduciary capacity to the company at the time they bought the mine. It was held that the evidence failed to show this to be the fact, and that they were not liable to refund the profit they made on the transaction. The judgment of Justice STIRLING, 34 Ch. D., *supra,* was appealed from, and this appeal constitutes the case in 35 Ch. Div., *supra,* in which the former judgment was sustained. There are several opinions. In that by COTTON, L. J., it is said that the plaintiff claims that the defendants stood in such a position at the time of their purchase that they could not have claimed to have bought the mine for themselves, and could not, therefore, sell it at an advanced price, to the company. This is said to be mainly a question of fact; and on that question the contract of February 1st, 1873, was in its terms perfectly absolute, and not dependent on any company being formed; that though

doubtless it was contemplated a company should be formed, no part of the purchase money was to be provided for out of the funds of the company, or to consist of shares of the company; and it is added: "One thing which is very strong in favor of the defendants, is that the whole of the price £5,000, was, in fact, completely paid when the lease was granted out of their own money, and not in any way out of money provided by means of this company;" and finally, it is said that the facts found did not make the defendants, at the time when they entered into the contract to purchase, persons so acting as to entitle the company afterwards to say: "When you bought this mine, you were acting for us; this purchase, although made by you, is one which must be considered as having been made by you for the company which was afterwards formed at your invitation." LINDLEY, L. J., concurring, said there might be a case for rescission, if rescission were possible; but that rescission was not possible, because the property assigned by the company did not belong to it any longer. He added: "Then we are driven to consider the point which was really raised and decided in *In re Cape Breton Company*, whether rescission being impossible the company can obtain from Palin an account of the profit which he made by the transactions which have been alluded to, and that depends really upon the evidence. But the evidence is not sufficient to enable them to succeed. It is not proved that when Palin bought—that is on the 1st of February, 1873, he bought for the company which was ultimately formed; nor that when he bought the company was so far formed as to entitle it or its members to claim the benefit of the purchase on any theory of trusteeship; nor is it proved that persons were induced to take shares on the faith that the new company was buying from the old company. It is plain that the new company did not, in fact, find the money with which the vendors were paid. Under those circumstances, can we say that there was any such relation between Palin and the company as to entitle the company to say, You bought for us? It appears to me that the evidence is not sufficient for that purpose. If it were we could see our way to give relief.'

Loopes, L. J., also concurring, said: "The question is, did Palin and his associates, on the 1st of February, stand in a fiduciary position towards this company that was thereafter to be formed; or, in other words, were they then acting for the company about to be formed? If they were the plaintiffs are entitled to succeed." This, he said, was entirely a question of evidence, and that in his view the evidence did not establish this conclusion. "They bought the mine themselves and paid for it out of their own pockets. No person is called to say they were asked to take shares, by any of these vendors, because they were forming a company." He concludes: "No doubt, having regard to the secret profit that was made by these vendors the company might have claimed rescission of the contract, but, in the circumstances, rescission had become impossible."

The other cases may be more briefly stated. In *Gover's Case, supra,* one Mappin agreed to buy a patent from Skoines for £65,000, payable partly in cash, and partly in shares of a company to be formed to use the invention. Mappin also engaged to use his best efforts to organize the company. Three months later Mappin agreed with one Wright, who acted as trustee for the proposed company, to sell the patent to it for £125,000 payable in cash and shares, and it was also agreed that Mappin should be appointed managing director. The company was formed and Mappin became a director. The suit was an application by Miss Gover, a subscriber pressed to pay "calls," to have her name removed from the company's register of members, because of the failure to disclose the Mappin-Skoines contract in the prospectus. It was decided that the statute did not give a remedy against the company, but only against a delinquent promoter, and it held that Mappin was not a promoter when he made the contract.

In *Erlanger* v. *New Sombrero Phosphate Co., supra,* a leasehold interest in the island of Sombrero was purchased by a syndicate acting for themselves alone, and not as the representatives of any corporation existing or proposed. Soon afterwards they formed a joint stock company and sold the lease to it for double the price paid by them. The contract

of purchase by the corporation, at its instance, was set aside. In *In re Cape Breton Company*, *supra*, the facts, briefly, were : One Fenn was the agent of a company to purchase a specific property, in which, before the commencement of his agency, he had acquired an interest. He did purchase it for the company without disclosing to the company his interest in the property. After his purchase the facts were fully disclosed, and with the knowledge so acquired the company elected to retain the property. It was held the company could not recover. But the court said : " This case is not the case of an agent who, after he has accepted the agency, has acquired property, the purchase of which was within the scope of his agency, and then has resold that property to his principal at a larger sum, in which case it is obvious that the principal may say that the original purchase by the agent at a small price was a purchase in behalf of the principal."

In *Barr* v. *New York, Lake Erie & Western Railroad Co.*, 125 N. Y. 263, 277, it is sufficient to say that the principle is laid down that a voidable contract remains good until rescinded, and that to rescind, the property obtained under the contract must be returned.

Who and what are promoters, so called, of corporations, and what their relations to the corporations which they help to form, has been more frequently judicially considered and determined by the English courts than by those of this country. Some English cases appear to be more in point, as applicable to the questions arising upon the record, than those cited by the defendant, to which we have just referred. A promoter has been defined to be a person who organizes a corporation. It is said to be not a legal but a business term, " usefully summing up, in a single word, a number of business operations, familiar to the commercial world, by which a company is generally brought into existence." BOWEN, J., in *Whaley Bridge Calico Printing Co.* v. *Green et al.*, 28 Wkly. Rep., (Q. B. Div., 1880,) 351, 352. That such persons occupy a fiduciary relation toward the company or corporation whose organization they seek to promote, is well settled by the decisions of both countries. Lord COTTON prefers to

call them " trustees." *Bagnall* v. *Carlton*, 6·Ch. Div., 385.
Sir George JESSEL, M. R., in *New Sombrero Phosphate Co.*
v. *Erlanger, supra,* said : " Promoters stand in a fiduciary re-
lation to that company which is their creature." In *Erlanger*
v. *New Sombrero Phosphate Co., supra,* the Lord Chancellor
said of promoters : " They stand, in my opinion, undoubtedly
in a fiduciary position.  They have in their hands the crea-
tion and molding of the company ; they have the power of
defining how, and when, and in what shape, and under what
supervision, it shall start into existence and begin to act as
a trading corporation.  If they are doing all this in order that
the company may, as soon as it starts into life, become, through
its managing directors, the purchasers of the property of them-
selves, the promoters, it is, in my opinion, incumbent upon
the promoters to take care that in forming the company they
provide it with an executive, that is to say, with a board of
directors, who shall both be aware that the property which
they are asked to buy is the property of the promoters, and
who shall be competent and impartial judges as to whether
the purchase ought or ought not to be made.  I do not say
that the owner of property may not promote and form a joint
stock company, and then sell his property to it, but I do say
that if he does he is bound to take care that he sell it to the
company through the medium of a board of directors who
can and do exercise an independent and intelligent judg-
ment on the transaction, and who are not left under the be-
lief that the property belongs, not to the promoter, but to
some other person."  Lord O'HAGAN, referring to the same
subject, expressed a similiar opinion in even more emphatic
language, declaring that while an original purchase might be
legitimate, and not less so, because the object of the pur-
chaser was to sell it again, and to sell it by forming a com-
pany which might afford them a profit on the transaction,
yet : " The privilege given them for promoting such a com-
pany for such an object, involved obligations of a very serious
kind.  It required, in its exercise, the utmost good faith, the
completest truthfulness, and a careful regard to the protec-
tion of the future stockholders."

The test, therefore, of the validity of such transactions is that it must, in all its parts, be open and fair, so that the promoters shall not in fact, substantially " act both as vendors and vendees, and in the latter capacity, approve a transaction suggested by them in the former." *Foss* v. *Harbottle*, 2 Hare, 461, 488; *McElhenny's Appeal, Hubert Oil Co.*, 61 Pa. St., 188; *Simons* v. *Vulcan Oil and Mining Co.*, 61 id., 202; *Densmore Oil Co.* v. *Densmore et al.*, 64 id., 43; *Pittsburgh Mining Co.* v. *Spooner*, 74 Wis., 307 ; *So. Joplin Land Co.* v. *Case et al.*, 104 Mo., 572; *In re British Seamless Paper Box Co.*, L. R., 17 Ch. Div., 467; *Phosphate Sewage Co.* v. *Hartmont*, L. R., 5 id., 394. In the last case, the distinctive feature was that the vendors paid the commission to the trustees who received the property on behalf of the company. They were compelled to pay it to the company. In *Hichens* v. *Congreve*, 1 Russ. & My., 150, (on appeal, 4 Russ. Ch., 562,) three promoters induced their company to buy a mine for £25,000, of which they received from the vendor and divided among themselves £15,000. This they were compelled to account for to the company. Similar cases are *Beck* v. *Kantorowicz*, 3 Kay & Johnson, 230; *Whaley B. C. P. Co.* v. *Green et al., supra ; Emma Silver Mining Co.* v. *Grant*, 11 Ch. Div., 918; *Bagnall* v. *Carlton, supra ; Kent* v. *Freehold Land & Brick-making Co. (Limited)*, 17 L. T., N. S., 77 ; *Ex-Mission Land & Water Co.* v. *Flash et al.*, 97 Cal., 610.

It is an undoubted rule of law that where two or more persons associate themselves for the purpose of purchasing property, and one of them represents to the others that particular property can be bought for a designated price, which he procures to be paid by his associates, when in fact he receives a difference between said sum and a less one, he may be compelled to account for such difference without any rescision of the contract, and although the property may be worth all or more than was paid for it. *Emery* v. *Parrott*, 107 Mass., 95. The same principle is applied against promoters of corporations, in case of any secret contract more favorable than that disclosed. *Pittsburgh Mining Co.* v. *Spooner, supra*, and

the very numerous cases therein cited; and an exhaustive note by Mr. Freeman, to said case, 17 Am. St. Rep., 149, 167. See also, as applied to directors, Cook on Stock, §§ 649, 650; *Gilman, Clinton & Springfield Railroad Co.* v. *Kelly et al.,* 77 Ill., 426; *Wardell* v. *Railroad Co.,* 103 U. S., 651; *Mc-Gourkey* v. *Toledo & Ohio Central Railroad Co.,* 146 id., 536.

A careful examination of the cases, will, we think, disclose two grounds of the liability of defendants to corporations for undisclosed profits resulting from transactions with such corporations; first, where the defendants are corporate fiduciaries. The characteristic of this relation is trust. Such a relation undoubtedly exists between companies and their officers, such as directors. *Mallory* v. *Mallory Wheeler Co.,* 61 Conn., 135. With reference to promoters, since a man cannot receive an appointment from a non-existent company, the proof may be less obvious; but it may nevertheless be shown conclusively, by a variety of representations, admissions and acts. The second ground of liability is fraud. The law does not prohibit a promoter from dealing with his company. But he must make full disclosure to the company of his relations to the property that is the subject of his deal. Suppression, concealment, or misrepresentation of material facts, is fraud; upon proof of which, rescission of contract, or repayment of the secret profits will be compelled.

A very recent English case, in which a secret arrangement between a promoter and a director of a company was considered, is that of *In re North Australian Territory Company* (*Archer's Case*), L. R. 1892, Ch. Div., Vol. 1, p. 322. The facts in the case were these: Archer being requested by the promoter of a projected company to become a director, agreed to do so upon the terms that if he should at any time desire to part with the shares he was to take in order to qualify him as director, the promoter should purchase them of him at the price he should pay for them. The company was subsequently formed, and Archer became a director, took the qualification shares, and paid for them at par, out of his own money, and from time to time acted as director; but he never

disclosed to his co-directors, or to the company, his agreement with the promoter. He afterwards resigned his office of director, and, subsequently to his resignation, the promoter, at his request, paid to him the sum which he had paid for the shares, and accepted a transfer of them. At that time the shares were valueless in the market. In the winding up of the company, the liquidators asked that Archer be ordered to pay to them the sum received by him from the promoter, with interest; and it was held, reversing the lower court, that, having regard to his position, as director of, and therefore agent for the company, whatever benefit or profit accrued to him under the indemnity constituted by his secret agreements with the promoter, belonged to the company; and that the retention by him of the proceeds of the indemnity occasioned a loss to the company, for which he was accountable, with interest, upon what was declared to be the principle of *Hay's Case*, Law Rep., 10 Ch., 593, and *Pearson's Case*, 5 Ch. Div., 336. During the argument the counsel for the liquidators, in support of the appeal, were stopped by the court, and counsel for Archer then proceeding, were submitted to some peculiar interruptions by the judges. FRY, L. J., asked: " Why should not Archer be accountable for the £500, as ' property' of the company retained by him?" Counsel replied: " The real question is, Did the company suffer loss by what was done? They never had the £500, and therefore cannot be said to have lost it. In the majority of cases in which a director has been held accountable to the company he has, in effect, received money which originally came from the coffers of the company, as in *Hay's Case*, and the cases already mentioned." BOWEN, L. J.: " *Smith* being in a fiduciary relation to the company, had no right to give a director a benefit without the company knowing it. An indemnity against loss is a valuable consideration." Counsel said: " At the time the letter was written *Archer* had not taken the shares, and had not then agreed to become a director. Again, there is no evidence that the contract was not disclosed to the company." FRY, L. J., asked: " Would an honorable man assent, as *Archer* did, to accepting this indemnity, on the

terms that he was to keep it secret? If it was not actually dishonest, it seems to me to. be a very improper course of proceeding." BOWEN, L. J.: "Is it right that the wolf should give a sop to the watch-dog, without his master's leave?" This question appears to have practically "closed the debate." The opinions of the judges, separately declared, appear at considerable length in the report, and are so able and apposite, that we regret that we cannot feel warranted in quoting from them.

Applying the principles recognized in the decisions to which we have referred, to the case before us, it seems clear that the plaintiff in the principal case is entitled to recover. The finding is explicit that the original arrangement between Wilcox and Foley contemplated no acquisition of any interest in the patents by Wilcox, but the organization by Wilcox of a corporation, and the sale to it of such patents; then a division between Foley and Wilcox of the avails of such sales. The written contract between Wilcox and Foley was entered into for the purpose of carrying out said plan of organizing the company, selling the patent and dividing the avails. In the agreement itself, while it is stated, under a "whereas," that Wilcox is desirous of owning one half of said patents, yet the very writing discloses that the proper construction of this language is that the patents, as belonging to Foley, should be sold to a joint stock corporation to be organized by Wilcox, for twice the sum that Foley was willing to dispose of them for, namely, for the sum of three thousand dollars in cash to be received from the company, and five thousand dollars of the capital stock of the company, and that then Foley should give to "said Wilcox, one half of the three thousand dollars cash, as soon as received, and one half of the five thousand dollars of the capital stock of the company, as he shall receive it."

Such being the arrangement, it was, very appropriately, agreed that it should be kept secret. Wilcox, in soliciting subscriptions for stock, most scrupulously observed such obligation of secrecy, and also went further, and "for the purpose of inducing persons to subscribe for said stock, stated to

nearly all of the persons who subscribed for said stock, and who now constitute the stockholders of said company, that he, Wilcox, was putting his money into said enterprise upon precisely the same basis as the other of said subscribers. And it was with that understanding that nearly all of said persons subscribed for said stock." The corporation was organized, and Wilcox, at its first meeting, was present, and was elected temporary clerk and a director, and voted in favor of a resolution which was adopted, which recited that Foley was the owner of certain letters patent, necessary and convenient for the purposes of the company, and which directed their purchase for certain stock, and the sum of three thousand dollars in cash.

It will thus be seen that the transaction between Wilcox and Foley contemplated, and Wilcox, in its execution, both as promoter and director, used every possible species of bad faith, breach of trust, and infidelity while occupying such a fiduciary relation. Placing the actual conduct of Wilcox side by side with the standard of conduct required of those in such positions, as declared by the judges in the *New Sombrero Phosphate Co. Case, supra,* so much relied upon as authority by the defendant, the contrast is overpowering.

Although many of the very numerous cases which we have cited, and almost numberless others to which reference might also be made, are direct authorities for the doctrine that in such cases as that before us, a defendant may be compelled to account, though no offer of rescission is made, and the property may be worth as much or more than was paid for it, and although the subject has already been incidentally referred to and considered in certain aspects of it, in this opinion, yet, in view of certain language in some of the cases upon which the defendant relies, including *Mallory* v. *Mallory Wheeler Co., supra,* and *Tryon* v. *White & Corbin Co.,* 62 Conn., 171, it may be useful further to say, that properly understood, there is nothing in any of such cases cited by the defendant in conflict with the doctrine stated. Thus, in *Mallory* v. *Mallory Wheeler Co., supra,* the plaintiff sought to recover a sum as balance of salary claimed to be due him

126.       FEBRUARY, 1894.

Yale Gas Stove Co. v. Wilcox.    Wilcox v. Foley.

for services rendered as chief manager and director of the defendant's business. It was claimed that the contract under which such service was performed was void, or if not void that it was voidable at the option of the corporation. This court, treating it as a case in which a director had made use of a fiduciary relation to secure for himself an advantageous contract for a salary, held that, independent of the question of public policy, such transaction was voidable at the election of the corporation. The court then added: "It may fairly be gathered from the authorities cited, that the rule we are now considering does not operate *ipso vire* to avoid every transaction of a trustee made with his beneficiary, in which he is interested. It is generally limited in its operation to rendering it voidable at the election of the party whose interests are concerned in the question of its affirmance or disaffirmance. If, therefore, nothing was done in avoidance, the transaction remains. 2 Pomeroy's Eq., § 1077; *Duncomb et al.* v. *New York, Housatonic & Northern Railroad Co.*, 84 N. Y., 190, 198. Much more if the transaction has been ratified by that party. *Barr* v. *New York, Lake Erie & Western Railroad Co.*, 125 N. Y., 255." This court, in that case, was considering a transaction in which there was no concealment or secret profit, and nothing proved to have been done, in actual, as distinguished from constructive bad faith, or fraud, and the plain distinction between such a case and the one under consideration in reference to equitable relief, is clearly shown in the section referred to in Pomeroy, 1077, and the very numerous authorities cited in the exhaustive note to that section, in the second edition. The same thing may be said in reference to other cases relied upon by the defendant; and we think the contention that a person who, first as a promoter, then as a director, induces a corporation to embark its capital in a business in such a way that the rescission of its purchase of property, essential to the continued life of the company, can only be made by the sacrifice of such existence, can retain his secret profits in the transaction, unless the contract shall be rescinded and the enterprise abandoned, is contrary to the doctrine of numer-

ous cases, and without the intended sanction of any. Such a rule would permit retention of secret profits, and its enforcement would turn the courts into promoters, not of corporations, but of frauds upon them, numerous enough as they are, and needing no such promotion. " It is a general rule that a party defrauded in a bargain, may, on discovering the fraud, either rescind the contract and demand back what has been received under it, or he may affirm the bargain, and sue and recover damages for the fraud." Cooley on Torts, 589, 591, and cases cited in note 2. Thus, if, after discovering a shortage in goods, the price is paid, an action lies for the fraud, although the contract may not be disaffirmed. *Numan* v. *Oberle*, 90 Mo., 666. So also, in case of wrong dealing by a trustee, the rule is, when the facts come to the knowledge of the *cestui que trust*, he may either affirm or repudiate the transaction, and if he does the former he may yet recover secret profits. Thus, where a partner sold his own goods to a partnership without the knowledge of his associates, he was held liable to account to them for the profits. *Bentley* v. *Craven*, 18 Beavan, 75. See also, *Kimber* v. *Barber*, L. R., 8 Ch. App., 56 ; *Getty et al.* v. *Devlin et al.*, 54 N. Y., 412.

The same rule applies in the law of principal and agent, and of attorney and client; indeed in every case where one improperly conducts himself to his own advantage while acting in any fiduciary capacity. The language, therefore, cited from *Mallory* v. *Mallory Wheeler Co.*, and the statement in *Tryon* v. *White & Corbin Co.*, *supra*, p. 173, that " an acceptance of the benefits of the transaction imposes an obligation to assume its burdens," and the principles stated in other decisions relied upon by the defendant, have no legitimate application to cases where a corporation seeks to recover from a promoter or director money had and received, which in equity and good conscience belonged to the corporation. Instead of rescinding the transaction of purchase, the corporation by its suit, affirms it and enforces the real contract as made for its benefit, and not the pretended contract, as simulated, in order to defraud it. In such a case the

corporation recognizes the obligation to assume the burdens, and only demands that it shall receive "the benefits of the transaction." Indeed the principle of *Murray* v. *Jennings*, 42 Conn., 9, is decisive of this whole matter.

The defendant in the principal case further contends that the Yale Gas Stove Company does not appear in court with clean hands. It is said the finding shows that, "the real bargain between Foley and the Yale Gas Stove Co., fixed the price to be paid for his patents at $3,000 in cash and $5,000 in stock;" but that to avoid the joint stock law, and to defraud the public, a sham contract was made; that thereafter a court of equity should leave them where they have placed themselves. "With what propriety," it is asked, "can the court decree that one party shall give up to the other an illegal profit, while permitting that other to keep an equally illegal profit obtained in the same transaction."

The maxim that "he who comes into equity must come with clean hands," has no such application as the defendant seeks to give it. It refers solely to willful misconduct in regard to the matter in litigation. Snell's Eq., 35. Though an obligation be indirectly connected with an illegal transaction, it will not thereby be barred from enforcement, if the plaintiff does not require the aid of the illegal transaction to make out his case. *Armstrong* v. *American Exchange Bank of Chicago*, 133 U. S., 433; *Lewis' & Nelson's Appeal*, 67 Pa. St., 153, 166; *Woodward* v. *Woodward*, 41 N. J. Eq., 224· *Pittsburgh Mining Co.* v. *Spooner, supra.*

Finally, the suit was properly brought by the corporation, instead of by its stockholders. The question arose in *New Sombrero Phosphate Co.* v. *Erlanger, supra,* and JAMES, L. J., said (5 Ch. Div., p. 122): "The company represent the contracts of yesterday as of to-day, as they will the contracts of to-morrow or the next day, or next year. They represent the contracts which were made by the company; they are liable upon the contracts, and they have every right in respect of those contracts which an individual being would have if he had the like case, or was under the like liability. Therefore, I am of the opinion that the company not only can sue, but

that the company was the only proper plaintiff that could sue upon the case made by this bill." See, also, 1 Morawetz, § 546; 3 Pomeroy's Eq., §§ 1094, 1096, and the numerous cases therein cited. Indeed, no contention upon this point was made.

In reference to the suit of *Wilcox* v. *Foley*, the contract between them was manifestly opposed to public policy, to good morals; it is illegal, and cannot be enforced. If any one has a cause of action against Foley, not upon the contract but by reason of the transaction to which it led, it is the corporation, and not Wilcox.

The Superior Court is advised that judgment be rendered for the plaintiff, in *Yale Gas Stove Co.* v. *Wilcox*, to recover three thousand dollars, with interest on $500 of said sum, from Oct. 9th, 1890, to the date of said judgment, and interest on the balance of $2,500, from Dec. 1st, 1890, with costs. And in the case of *Wilcox* v. *Foley*, that judgment be rendered for the defendant.

In this opinion the other judges concurred.