JOHN K. HAYWARD *vs.* JOSEPH R. LEESON.
SAME *vs.* JOHN HOPEWELL, JR.

Suffolk. December 12, 13, 1899. — June 15, 1900.

Present: HOLMES, C. J., MORTON, BARKER, HAMMOND, & LORING, JJ.

*Corporation — Secret Profits made by Promoters — Fraud — Damages —*
*Parties.*

Promoters of a corporation, who, before any capital stock has been issued to the public, cause to be issued to themselves, as a remuneration for their services as such promoters, by the vote of all persons who then had any interest in the corporation, they being the promoters, one third of the whole capital stock, and then issue a prospectus to the public inviting subscriptions to the stock without disclosing that fact, are guilty of a fraud, and are liable to a suit in equity, which should be brought in the name of the corporation and not in that of the receiver, to account for the net profits received by them, less the expenses of the formation of the corporation paid by them, the plaintiff having the option to follow the shares or the proceeds or to recover damages, and not being obliged to tender back the lands acquired by the corporation under a contract executed in pursuance of the vote above named; and the objections that the suit was being prosecuted for the benefit of certain persons to the exclusion of other creditors of the corporation, and that it was not proved that the persons named were creditors, are not tenable on the facts in this case.

TWO BILLS IN EQUITY, filed in the Superior Court, by the receiver of the East Tennessee Land Company, to recover alleged secret profits made by the defendants as promoters of that corporation. The cases were heard together before *Richardson* J., who reported them for the determination of this court. The facts appear in the opinion.

*W. H. Russell,* (of New York,) (*W. B. Winslow,* of New York, *& L. G. Farmer* with him,) for the plaintiff.

*A. Hemenway & I. R. Clark,* for the defendants.

LORING, J. These two cases were heard together in the Superior Court; certain findings on the material facts were made, which are set forth in a report, and the questions of law arising thereon were reserved for this court.

The suits were begun by the receiver of the East Tennessee Land Company, an insolvent corporation, to recover from the defendants secret profits made by them as promoters of that company.

By a confidential circular dated March 25, 1889, the Phœnix Land Company proposed to the defendants and eight other persons that they should associate themselves together as a Syndicate of Ten to advance to the Phœnix Land Company from $15,000 to $30,000, which should be used in obtaining options on some 225,000 to 300,000 acres of land in three specified counties in the State of Tennessee; these lands were stated in the circular to be underlaid in part with iron and in part with coal, to be well wooded, to have a soil of fair agricultural value, and to have the most healthful average climate of the South, and therefore appropriate for a health resort for the South in summer and for the North in winter; that the price for which they could be obtained was about $800,000, to which should be added $100,000 for possible expenses, and that they were really worth $1,500,000, showing a profit of $600,000. It was proposed that options on these lands should be obtained in the name of the Phœnix Land Company, and when the options were obtained, a thorough investigation should be made and the opinion of an expert obtained as to their value; that the Phœnix Land Company and the Syndicate of Ten should then organize a corporation, and, through subscriptions to its capital stock made by the public and secured by means of a prospectus, the corporation would be able to, and should, buy the options at a price fixed by the two parties to the enterprise, the Phœnix Land Company and the Syndicate of Ten, and the net profits, after paying all actual expenses incurred, should be divided between the two.

The Phœnix Land Company was a corporation organized under the laws of the State of Tennessee, on March 15, 1889,— just ten days before the date of the circular mentioned above,— by Frederick Gates, his son R. W. Gates, his two partners in the real estate business at Chattanooga, A. W. Sidebottom and O. F. Jaynes, together with one Alphonso A. Hopkins of Elmira in the State of New York. These five men were all the incorporators, directors, or subscribers to stock in said corporation, and "it does not appear that any stock of said Phœnix Land Company was actually issued, or that it had any paid-up capital stock at any time, or that it owned any land."

The defendants, together with eight other persons, accepted this proposal, and an agreement between the Syndicate of Ten

and the Phœnix Land Company was completed May 6, 1889 ; this agreement is spoken of in the report, as paper No. 31, and as the agreement of March 25, 1889, and it included a paper referred to in the report as " The Plan more in detail." The plan laid out in this agreement was substantially carried into effect; it was departed from in this, that the parties organized the corporation which was to purchase the options from them at an advance, when they had obtained options on about one third of the lands which they proposed the company should ultimately own, in place of waiting until options on all the lands had been secured. The certificate of incorporation of the new : company was issued on May 25, 1889, and its name was the East Tennessee Land Company. The purchase price of the land on which the parties had then secured options was $322,694, of, which the Phœnix Land Company had paid $6,008, leaving $316,686 to be paid. On June 6, the incorporators of the Phœnix Land Company subscribed individually to shares in the East Tennessee Land Company, to the amount of $250,000 par value ; the members of the Syndicate of Ten also subscribed to shares to the same amount, and the Phœnix Land Company, in its corporate name, subscribed to shares to the amount of $200,000 par value. In addition, shares amounting to $10,000 were subscribed by one Mason, in whose name some of the options subsequently secured were taken.

There were thirteen incorporators of the East Tennessee Land Company. Gates and one of his associates were two; ten of the members of the Syndicate of Ten, together with the said Mason, made the thirteen ; it appears that one of the original members of the Syndicate of Ten divided his interest in two, so that there were ultimately eleven members in the syndicate of Ten, two of them having a half share each.

On June 10, 1889, the first meeting of the stockholders of the East Tennessee Land Company was held, and all the incorporators and stockholders were present in person or by proxy. At this meeting it was voted that the corporation should make a contract with the Phœnix Land Company whereby, in consideration of the Phœnix Land Company's assigning all options then held or thereafter acquired by it, and of its agreeing to secure further options at the expense of the East Tennessee

Land Company, during the ensuing six months, the East Tennessee Land Company should agree: (1) To pay all expenses of the Phœnix Land Company in procuring further options under the contract; (2) To pay all sums due as purchase money under the options assigned to it, whether then owned or thereafter acquired; and (3) To issue to the Phœnix Land Company paid-up shares in its capital stock to the amount of $700,000. This contract was executed on the next day, June 11, 1889. The stockholders also passed a resolution instructing the secretary, on this contract being executed by the Phœnix Land Company, to issue to it paid-up shares to the amount of $200,000 par value, and to issue such shares to the amount of $500,000 par value to persons presenting orders therefor from the Phœnix Land Company, charging the same to the Phœnix Land Company. On or about July 3, 1889, Gates and his associates in the Phœnix Land Company presented orders from the Phœnix Land Company for shares to the amount of $250,000, and certificates therefor were issued to them; at the same time, the defendants, with their associates in the Syndicate of Ten, presented orders for the issue to them of shares to the amount of $250,000, and certificates therefor were issued to them; the Phœnix Land Company did not originally take out certificates for the $200,000 of shares which were to be issued to it, but they were subsequently issued from time to time to persons to whom they were sold by it.

In December, 1889, the East Tennessee Land Company issued a prospectus inviting subscriptions to the capital stock of the corporation. In this prospectus it is stated, among other things, that "The capital stock of this company represents actual value without inflation, but does not approximate the entire value of the properties on which it is based. It was the intention of the projectors and incorporators to shape this enterprise so that its stock should be as solid as that of a national bank. Over half a million dollars of its capital were subscribed before the company's organization, at par. Subscriptions for the remainder are now solicited." And no other reference was made to the fact that the $700,000 of paid-up shares in question had been subscribed for, and no statement was made as to the way in which those $700,000 of shares had been paid for and issued.

" Large tracts of land were, in 1889, 1890, 1891, 1892, purchased by the East Tennessee Land Company . . . , and during said years it had laid out and made streets on such lands purchased by it, erected buildings, and started manufacturing industries, so that where there was a population of less than one hundred and three or four poor buildings on June 1, 1889, there was on June 1, 1893, a population of about four thousand and several hundred buildings. . . . The amount of stock issued by the East Tennessee Land Company in all to subscribers and purchasers was approximately two million dollars par value, including the $700,000 issued " under the contract of June 11. The East Tennessee Land Company also issued its mortgage bonds, dated October 1, 1890, to the amount of $1,000,000.

On November 18, 1893, one Schumacher filed a bill in equity in the Circuit Court of the United States for the Southern Division of the Eastern District of Tennessee, in behalf of himself and all other unsecured creditors of the East Tennessee Land Company, alleging that the company was insolvent, and praying that its property might be realized and the proceeds distributed among its creditors; in this suit receivers were appointed to take possession of all the property of the corporation. The Central Trust Company of New York, the trustee named in the mortgage given to secure the bonds of the East Tennessee Land Company, filed a bill to foreclose that mortgage on March 11, 1894, the two causes were consolidated, and the receivership was extended to the consolidated cause. The consolidated cause was referred to a master; upon the coming in of the master's report a decree was entered on February 27, 1897, establishing the validity of the mortgage, ascertaining the debts thereby secured and the other debts of the corporation, directing the property of the corporation to be sold, and decreeing the order of distribution of the proceeds derived therefrom. By this decree it was found that the debt of the East Tennessee Land Company at that time was as follows: (1) Mortgage debt, $1,164,836.58; (2) Vendors' lien on company's land, $165,233.81; (3) Secured debt, $202,409.09, and unsecured debt, $224,818.04; amounting to $1,757,297.52, and, in addition, $9,631.10, due on receivers' certificates issued to raise money to pay taxes. The report on which this case comes up from the Superior Court

states that the gross sum realized by the sale of the property of the East Tennessee Land Company, under the decree of February 27, 1897, was $125,372.50.   On May 20, 1895, an order was made in the consolidated cause directing the receivers to institute certain proceedings, and, among others, the two suits now before this court.   The prosecution of these suits was subsequently suspended by order of the court; but on July 1, 1897, an order was made directing the receiver to proceed with the prosecution thereof.

Stripped of the surroundings which tend to obscure its real nature, the transaction in which the defendants took part was this:  Gates and his four associates, and the defendants and their nine associates, believing that a tract of some 225,000 to 300,000 acres of land in Tennessee had natural resources which could be developed at a great profit, agreed to join themselves together to secure options on the land, and then organized a corporation which was to buy the options of them at a profit; this profit, after paying all actual expenses incurred in procuring the options and organizing the corporation, was to be divided equally between Gates and his associates operating under the name of the Phœnix Land Company, and the defendants and their associates operating as the Syndicate of Ten.   In this joint adventure Gates and his associates contributed their information as to the land, and the defendants and their associates contributed the money ($15,000 to $30,000) to be advanced for the expenses of the enterprise, until the corporation to be organized was organized and was in funds, when these advances were to be repaid by it.   It was stated in the agreement providing for this joint adventure that the profit which they would secure from the corporation for the transfer of these options would be some $700,000; the cost of the lands being estimated to be $900,000, including $100,000 for expenses, and the value of the lands to the corporation being stated to be $1,500,000; if the $100,000 of expenses included in the $900,000 were repaid to them, the difference between the two, that is to say, the net profit to the promoters of the corporation, would be $700,000; it was also agreed that "at least five sixths of its net profit shall be taken by each of these two contracting parties in stock of the new corporation."

The only particulars in which the promoters departed from this plan, in carrying it into effect, were that they organized the corporation when only one third of the options contemplated had been secured, and that they then issued to themselves $700,000 of paid-up stock of the corporation as the net profits which they were to make in the transaction. Nominally, this $700,000 of paid-up stock was issued in payment for options then owned by the Phœnix Land Company, on which it had paid $6,000, and the agreement of that company to secure further options during a period of six months, at the expense of the new corporation. Really this $700,000 of paid-up stock was issued to the promoters as remuneration for their services as promoters, or, as it is termed in the report of the Superior Court, for the net profits which it was arranged in the agreement between the Phœnix Land Company and the Syndicate of Ten should be divided equally between the two; the twenty-first finding of the Superior Court is explicit on this point; it is, so far as material in this connection, as follows: " The sum named, $700,000, was not arrived at by any appraisal or attempted appraisal or valuation of any property, options, or contracts, or title bonds, etc., which the Phœnix Land Company had. . . . Said large sum was named as a consideration that it might be enough to include the 'profits' mentioned or contemplated in said paper marked 'No. 31,' and especially in clause 3 of the 'plan more in detail.' And the shares received by all the said syndicate members and some others on July 3 were then really understood to be the profits or 'net profits' mentioned in the ninth clause of said paper marked 'No. 31,' and in the third and sixth clauses of the 'plan more in detail' annexed thereto, which by that agreement were to be divided between the ten syndicate members and the Phœnix Land Company; and this also was known to all the then stockholders of the East Tennessee Land Company, to. wit, the thirteen directors of the East Tennessee Land Company and the officers of the Phœnix Land Company." The paper referred to in the report as paper marked " No. 31," and the "plan more in detail" annexed thereto, make up the agreement between Gates and his associates and the defendants and their associates, which was finally completed on May 6, 1889.

The defendants rely in this connection upon two of the findings set forth in the report, namely, (1) that the vote authorizing the contract of June 11 was passed " and the contract executed by which the East Tennessee Land Company agreed to pay said $700,000 for the lands, options, contracts, and title bonds of the Phœnix Land Company, with and upon the theory and belief — under advice of competent counsel practising in Tennessee to that effect — that it would satisfy the laws of Tennessee, both as to the payment in of the capital of said corporation, and would, by orders of the Phœnix Land Company, be a proper way and method of settling for the shares of stock which each of the defendants and others subscribed for and got" ; and (2), " I do not find that the defendants or either of them in signing the paper marked ' No. 31,' or in signing the subscription for stock on June 6th, and in becoming directors of the East Tennessee Land Company on June 10th, and in voting for the making of the contract with the Phœnix Land Company, and in taking, each, 250 shares of stock, intended any actual fraud, or intended to defraud or cheat either the corporation or the future stockholders or creditors of the East Tennessee Land Company. They did not anticipate the failure or insolvency of the company ; whatever those who originated the project expected, these defendants when they became parties to it believed (and I think not without some reason, with proper management) that it would succeed, and result in building up a prosperous town or city at Harriman." And the defendants contend that the stock issued to them was lawfully issued for interests in land and for services rendered or to be rendered ; that under these findings there was no fraudulent overvaluation in the issuing of the $700,000 of shares of stock ; that the issue of this stock was voted for by the defendants and others as stockholders, and that stockholders are under no fiduciary relation to anybody, and can do as they will with their own ; and, moreover, that it was consented to by all the stockholders and incorporators of the East Tennessee Land Company, and consequently cannot now be made the basis of any complaint by the corporation or anybody else.

But this argument omits from the case the fact that the defendants, together with their associates in the Syndicate of Ten, and Gates with his associates in the Phœnix Land Company,

were promoters of the East Tennessee Land Company, and that these suits are instituted to charge them with secret profits made by them as such promoters, and not on the ground that the stock subscribed for by them has not been paid for under the laws of Tennessee; whether it was or was not properly issued as paid-up stock so far as a compliance with Tennessee statutes is concerned, is not material, and we express no opinion upon that point. See *McKay's case*, 2 Ch. D. 1, 6, 8. Moreover, it is not sought, in these suits, to charge the defendants because they voted as stockholders to issue the $700,000 of stock; but it is sought to charge each defendant because he, with others, was a promoter of the East Tennessee Land Company; because as a promoter he stood in a fiduciary relation to the future shareholders of that corporation, and by reason thereof he could not receive any remuneration for his services as a promoter of that corporation without making a full disclosure thereof, and obtaining the consent of those shareholders thereto. *McKay's case*, 2 Ch. D. 1. *Bagnall* v. *Carlton*, 6 Ch. D. 371. *Emma Silver Mining Co.* v. *Grant*, 11 Ch. D. 918. *Emma Silver Mining Co.* v. *Lewis*, 4 C. P. D. 396. *Whaley Bridge Calico Printing Co.* v. *Green*, 5 Q. B. D. 109. *Lydney & Wigpool Iron Ore Co.* v. *Bird*, 33 Ch. D. 85. *Bland's case* [1893], 2 Ch. 612. *Archer's case*, [1892] 1 Ch. 322. *Hichens* v. *Congreve*, 4 Russ. 562; *S. C.* 1 Russ. & Myl. 150, *n.* *Beck* v. *Kantorowicz*, 3 K. & J. 230. *Pearson's case*, 5 Ch. D. 336. *Phosphate Sewage Co.* v. *Hartmont*, 5 Ch. D. 394. *Yale Gas Stove Co.* v. *Wilcox*, 64 Conn. 101. *Plaquemines Tropical Fruit Co.* v. *Buck*, 7 Dick. 219. *Chandler* v. *Bacon*, 30 Fed. Rep. 538. See also *Emery* v. *Parrott*, 107 Mass. 95. That a promoter stands in a fiduciary relation to the future shareholders, see *Venezuela Railway* v. *Kisch*, L. R. 2 H. L. 99; *New Sombrero Phosphate Co.* v. *Erlanger*, 5 Ch. D. 73; *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218; *Densmore Oil Co.* v. *Densmore*, 64 Penn. St. 43; *Bosher* v. *Richmond & Harrisonburg Land Co.* 89 Va. 455, 460, 461; *Pittsburg Mining Co.* v. *Spooner*, 74 Wis. 307; *Burbank* v. *Dennis*, 101 Cal. 90, 98; *South Joplin Land Co.* v. *Case*, 104 Mo. 572.

If the fullest effect is given to the finding of the court, that the defendants intended no actual fraud in taking two hundred and fifty shares each, and did not intend to defraud or cheat

either the corporation or the future stockholders or creditors of the East Tennessee Land Company, all that the finding means is that the defendants honestly believed that the natural resources of the lands in question were so great, that shares amounting to $700,000 par value would be a fair remuneration to be paid to them and their associates, for their services as promoters. But even if they did so believe and their belief was honest, and there was a foundation for that honest belief, they none the less were guilty of a fraud; it is a fraud for promoters to undertake to decide for the future stockholders in the corporation to be organized that one third of the whole capital stock of that corporation is a fair remuneration for their services as promoters, to issue one third of the capital stock to themselves as such remuneration, and then to invite the public to subscribe to the stock of the corporation, without disclosing that fact to the subscribers and without getting their consent to the payment of that remuneration.

The defendants say that they did disclose the fact to the East Tennessee Land Company, and that they did get the consent of the East Tennessee Land Company to the payment of this $700,000 of stock to them for their remuneration as promoters; and that is not only enough, but it is final. It is true that the vote, authorizing the issue of this stock to them as the profits which they were to have for the organization of the company, was voted unanimously by all the incorporators of the East Tennessee Land Company and by all, who were then subscribers to its capital stock, that is, by all the persons who then had any interest in that corporation, in short it is true that the fact, that the promoters were to receive $700,000 of paid-up capital stock as remuneration for their services, was disclosed, and consented to, by all the persons who then had any interest in the corporation. But it is also true that at that time no person except the promoters had any interest in the corporation, barring one Mason, in whose name some of the options were subsequently taken, and who was plainly a mere nominee of the promoters; and that at that time no capital stock of the corporation had been issued to the public. Payment to promoters of remuneration for their services is not made valid by a vote passed by the corporation, when the corporation is in the sole

control of the promoters before the capital has been issued to the public. *New Sombrero Phosphate Co.* v. *Erlanger*, 5 Ch. D. 73. *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218. *In re Olympia* [1898], 2 Ch. 153. *In re British Seamless Paper Box Co.* 17 Ch. D. 467, 471, 472. The persons to whom the promoters owe the duty which they owe by reason of their fiduciary relation are the persons who put their money into the enterprise at the invitation of the promoters, that is to say, the future stockholders. It is to the future stockholders that the promoters must make the disclosure of the remuneration which is, or is to be, paid to them, and it is the consent of the future stockholders that must be obtained to make that payment valid; if the promoters undertake to make to themselves remuneration for their services as promoters without making a full disclosure of the fact to the future stockholders, their principals, and getting their consent, they are guilty of a fraud. Promoters can make the necessary disclosure of the remuneration they stipulate for by including in the prospectus a full statement thereof; if such a statement is not made therein, they cannot honestly take any remuneration for promoters' services, unless it is voted by the stockholders after the capital stock has been taken by the public.

In this case it is found that " neither of the defendants personally did anything to conceal the paper marked ' No. 31,' the agreement of March 25th, or took any part in concealing or keeping it from the knowledge of future stockholders or creditors of the corporation. I find, however, that as a fact it was kept from the knowledge of the stockholders other than the thirteen directors aforesaid, and of future creditors, probably by the original inventors of the scheme, — the officers of the Phœnix Land Company, — until after the failure of the East Tennessee Land Company." That finding is conclusive of the defendants' liability; but there is a further finding which gives to the defendants' actions a more serious character, and that finding is this: " The prospectus made an exhibit to the deposition of A. A. Hopkins was issued with the consent and approval of the defendants Leeson and Hopewell, and was widely circulated among the general public." That prospectus contains the following statement: " The capital stock of this company repre-

sents actual value without inflation, but does not approximate the entire value of the properties on which it is based. It was the intention of the projectors and incorporators to shape this enterprise so that its stock should be as solid as that of a national bank. Over half a million dollars of its capital were subscribed before the company's organization, at par. Subscriptions for the remainder are now solicited." The defendants, therefore, not only did not disclose to their principals the fact that stock to the amount of $700,000 par value was issued to them and their associates as remuneration for promotion services, but a prospectus containing an incorrect and misleading, if not false, statement was issued with their consent and approval.

The defendants' next contention is that the action cannot be maintained until the East Tennessee Land Company tenders back to the Phœnix Land Company the lands acquired by it under the contract of June 11. But this is not a suit to recover damages from promoters for fraud in a sale of their property to the corporation organized by them as promoters; if it were, it is clear that it could be maintained without returning the lands which had been bought; if at the time when a fraud is discovered, which was perpetrated by promoters in a sale to the corporation of property owned by them, the property is no longer in the condition in which it was when the company took it, the company may, keeping the property, sue the promoters for the secret profits which it was their duty not to make without notifying the company thereof. *In re Olympia* [1898], 2 Ch. 153.

In the case at bar, the Phœnix Land Company has never been anything but a paper corporation, with five of the promoters of the East Tennessee Land Company as its incorporators, without capital stock, and without property. The lands bought by the East Tennessee Land Company were bought by that company from strangers who owned them. The suggestion that the East Tennessee Land Company must turn over to the Phœnix Land Company the lands which it bought of strangers means that the East Tennessee Land Company must turn over its lands to the promoters of the East Tennessee Land Company; the Phœnix Land Company was merely the paper corporation under whose shelter the promoters sought to obscure the real nature of their

transactions. That the corporation may sue for the secret profits made by a promoter who secured a sale of lands from a third person to the corporation without returning the lands obtained by means thereof, is well settled. *Emery* v. *Parrott*, 107 Mass. 95. *Lydney & Wigpool Iron Ore Co.* v. *Bird*, 33 Ch. D. 85, 94. *Emma Silver Mining Co.* v. *Lewis*, 4 C. P. D. 396.

In case of such a fraud by promoters, the corporation is entitled to follow the shares taken by the promoters or the proceeds thereof in the hands of the promoters, and to recover them specifically, or to recover damages for the loss thereof. *Carling's case*, 1 Ch. D. 115, 126, 127. *Nant-y-glo & Blaina Ironworks Co.* v. *Grave*, 12 Ch. D. 738, 747, 748. *Eden* v. *Ridsdales Railway Lamp & Lighting Co.* 23 Q. B. D. 368, 371, 372. *Pearson's case*, 5 Ch. D. 336, 341. *Chandler* v. *Bacon*, 30 Fed. Rep. 538. Promoters who have wrongfully taken remuneration for their services and have paid the promoters' expenses and the expenses of organizing the corporation are entitled to deduct those expenses in an accounting with the corporation. *Bagnall* v. *Carlton*, 6 Ch. D. 371, 400, 403, 407, 408. *Emma Silver Mining Co.* v. Grant, 11 Ch. D. 918, 939. *Metropolitan Coal Consumers' Association* v. *Scrimgeour* [1895], 2 Q. B. 604. In this case it appears by the seventeenth finding that all payments made in procuring the options after June 11, 1889, were repaid by the East Tennessee Land Company, but it does not appear that the $6,008 prepaid purchase money expended under options held by the Phœnix Land Company on June 10, 1889, has been repaid ; and there may be other expenses incurred by the promoters in the name of the Phœnix Land Company or otherwise in organizing the company, which, if not heretofore repaid to them, should be deducted by them in an accounting with the company.

The plaintiff claims that under the twenty-fifth finding of the Superior Court he is entitled to a decree against each defendant for $25,000 and interest, less his share of the expenses, which we have already dealt with. If the balance of this stock amounting to $1,300,000 par value had been subsequently issued for cash at par, the plaintiff would be entitled to such a decree. Ordinarily the damages are to be assessed as of the date of the taking; yet when, as in this case, the property taken had no value at that time, because it was stock of a corporation not then launched

into being, the date must be carried forward to the date when the value of the stock was fixed. See *Carling's case*, 1 Ch. D. 115, 126; *McKay's case*, 2 Ch. D. 1; *Pearson's case*, 5 Ch. D. 336; *De Ruvigne's case*, 5 Ch. D. 306; *Eden* v. *Ridsdales Railway Lamp & Lighting Co.* 23 Q. B. D. 368; *Chandler* v. *Bacon*, 30 Fed. Rep. 538; for cases in this Commonwealth where the value at some date other than the date of the wrongful conversion has been taken in actions to recover damages for the wrongful conversion of personal property, see *Fowle* v. *Ward*, 113 Mass. 548; *McKim* v. *Hibbard*, 142 Mass. 422.

But we are of opinion that the twenty-fifth finding ought not to be acted on as a finding warranting that decree; it is not in terms a finding as to the market value of the stock, neither is it in its terms a satisfactory finding, and it was not made in the light of the principles which it is now established govern the defendants' liability. The case therefore must stand for a hearing as to what the net profits are for which these defendants must severally account. At that hearing the plaintiff may follow the shares or the proceeds, or recover damages, as he may elect one or the other remedy. The defendants must account for the shares with the dividends received by them, or the proceeds with interest from the date when the proceeds were received by them, or for the fair market value of the stock with interest from the date when the market value may be found to have been established, as the plaintiff may have elected to proceed; and in any event the plaintiff must repay to the defendants or deduct from the sum due them the defendants' share of the expenses of the formation of the corporation paid by them and not heretofore repaid to them.

By the frame of the bills in equity in these two cases, and from the scope of the argument made in behalf of the plaintiff, the relief which the plaintiff seeks to recover from each defendant is limited to the two hundred and fifty shares issued to him, and the plaintiff does not seek to recover the one tenth of one half of the two hundred shares of stock originally subscribed for by the Phœnix Land Company, to which each defendant was entitled under the agreement between the Phœnix Land Company and the Syndicate of Ten by providing that all profits should be divided equally between the two contracting parties,

the Phœnix Land Company and the Syndicate of Ten. Nor does the plaintiff seek to recover the fifty shares received by each of the defendants, being one tenth of one half of the one hundred thousand shares issued to the Phœnix Land Company, under the adjustment of May 6, 1890, referred to in finding thirty-four. And lastly, from the frame of the bills, the plaintiff seeks to charge each defendant severally, and not to charge the defendants as jointly and severally liable with the other promoters for all secret profits received, whether received by them or their associates. *Bagnall* v. *Carlton*, 6 Ch. D. 371, 390, 411. *Bland's case* [1893], 2 Ch. 612. *Emery* v. *Parrott*, 107 Mass. 95, 103. For these reasons we do not express any opinion on these matters, and we have limited, as stated above, the matters, on which the case is to stand for hearing under the present bills.

The last objection made by the defendants is that the plaintiff as receiver cannot bring the suit in his own name; and we think that this objection is well taken.

The final order directing the receiver to prosecute these suits is as follows : " Said Jno K. Hayward, receiver, be and is hereby directed to proceed with said causes in the courts of Massachusetts, either in his own name as receiver, or in the name of the East Tennessee Land Company, or jointly in his name as receiver and in the name of the East Tennessee Land Company, as he may be advised by counsel to be proper, and in accordance with the rules of practice in the courts in which such cases are being prosecuted." This order does not operate as an assignment to the receiver of these choses in action. Neither did the previous orders, under which this receiver was acting, operate as an assignment of them ; the plaintiff was appointed a receiver by order dated April 20, 1897, providing that he should " possess the power and authority conferred by former orders " on the receivers ; the original order appointing receivers under the general creditors' bill provided that the receiver should " collect, take possession of, preserve and care for all of the property, real, personal and mixed, bonds, notes, bills, drafts, and other choses in action of the defendant wherever found, as well as of the accounts, books and papers of the defendant, and . . . hold and dispose of the same under the order of this court." There is nothing in the original order under which the bills in equity in

the cases at bar were filed which in any way affects this question. The plaintiff, as receiver, by virtue of these orders, has the powers usually conferred by a court of equity upon a receiver to preserve property pending litigation, and nothing more. Mr. Justice Gray, speaking for the Supreme Court of the United States of the powers of a receiver under a similar order, said: " The utmost effect of his appointment is to put the property from that time into his custody as an officer of the court, for the benefit of the party ultimately proved to be entitled, but not to change the title, or even the right of possession, in the property." *Union Bank of Chicago* v. *Kansas City Bank*, 136 U. S. 223, 236. That such a receiver cannot sue in his own name to enforce a right of action of the corporation is settled. *Wilson* v. *Welch*, 157 Mass. 77.

There is nothing in the objection that by the terms of the orders of the United States Circuit Court for the Southern Division of the Eastern District of Tennessee these suits are now being prosecuted for the benefit of the Harriman Land Company and one Rhodes, to the exclusion of other creditors, if any, of the East Tennessee Land Company, and the further objection that it was not proved in the suits now before the court that the Harriman Land Company and Rhodes were creditors of the East Tennessee Land Company. This is a fact, and the fact came about in the following way: The receivers of the East Tennessee Land Company were originally appointed under the general creditors' bill. When a bill was filed to foreclose the mortgage of the East Tennessee Land Company, the two causes were consolidated and the receivership was extended to the consolidated cause. The bill to foreclose was terminated by a decree directing a sale of the property, and after that decree had been carried into effect, the trustee of the mortgage filed a motion asking that the receiver should be discharged, or that it, the trustee, be absolved from costs of the receivership thereafter incurred. On this motion, the court entered an order directing that the costs and expenses of the receiver thereafter incurred should in no event be taxed to the plaintiff, the trustee of the mortgage, and directing that the funds theretofore realized should not be used to pay those costs and expenses. The order then recited that, as the receivership was continued to enforce

claims for secret profits, which claims would inure to the benefit of the general creditors, to the exclusion of the trustee of the mortgage, who disclaimed any interest therein, the receivership should continue only if the general creditors should give security for the payment of the receivers' expenses in those suits, and that the proceeds of those suits should be divided among those creditors who gave that security. In a general creditors' bill, only those creditors who come in under the decree and contribute to the suit are entitled to the fruits of the litigation, and the order of the Circuit Court in this connection was, under the circumstances, the only order which it could pass. Whether the Harriman Land Company and Rhodes are creditors of the East Tennessee Land Company is a question for the United States Circuit Court for the Southern Division of the Eastern District of Tennessee, and not for this court, (*McCarty's appeal,* 110 Penn. St. 379,) and the decision of that court on that point could not be attacked collaterally in these suits.

Upon substituting the East Tennessee Land Company as plaintiff in place of John K. Hayward, the causes are to stand for hearing as to what the net profits are, which the defendants have respectively received, or as to what the damages are, which the plaintiff has suffered, as the plaintiff shall elect to proceed for the property or its proceeds on the one hand, or for damages on the other hand.        *Decree accordingly.*