JOHN M. ANDERSON vs. ADOLF E. JOHNSON et al.

GRANT PIERCE vs. JAMES F. DONOVAN et al.

GRANT PIERCE vs. CLAUS HANSON et al.

FEBRUARY 5, 1923.

PRESENT: Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

(1)  Corporations.  Suit by Stockholders After Refusal of Corporation to Act.

The refusal of a corporation to continue the prosecution of proceedings against stockholders is of the same effect as a refusal to institute proceedings and the proceedings in such case may properly be brought by stockholders for the benefit of the corporation.

(2)  Corporations.  "Bonus" Stock.  Promoters.

Promoters of a corporation prior to the organization of the company entered into an agreement among themselves for the issuance to them of "bonus" stock.  After the organization three of the promoters acting as incorporators elected themselves directors and the plan was carried out by issuing the entire capital stock to X one of the promoters in exchange for his interest in certain contracts, formulæ, options,etc., which assets the directors resolved were reasonably worth the entire stock, and by the transfer by him of a portion to the treasury, the balance being distributed according to the agreement among the promoters.  The issue of the "bonus" stock to the promoters were never authorized by vote of either directors or stockholders.  The promoters' agreement was kept secret from the purchasers of the treasury stock.

Held, that it was immaterial that the stock appeared to be transferred from X., as it was really company stock that the promoters took and X was merely a conduit in the transaction.

Held, further, that the promoters had no authority to bind the corporation by any contract made between them and as the corporation was not in existence when the promoters agreement was made, it was incapable of making a contract.

Held, further, that the claim that the issue was in payment of services to be rendered by the promoters, could not be sustained where the agreement for future services was vague and indefinite in regard to the character and duration of the services and the corporation was not bound thereby.

(3)  Corporations.  Promoters.  Secret Dealings.

Promoters of a corporation hold a confidential and fiduciary relationship to a corporation and its stockholders.  While not precluded from dealing with the corporation any transaction to be valid must be fair and fully disclosed to the corporation and the other stockholders.

(4)  Corporations.  Promoters.  Contracts.

No contract is implied in fact on the part of a corporation to pay for promoters services, and neither the company nor non-assenting stockholders

will be bound by any agreement between promoters and directors of a company if the directors are the promoters or persons jointly interested with them or under their control.

(5)  *Corporations.  Promoters.  Contracts.*

Promoters in dealing with a corporation where it is intended to have other stockholders cannot in any transaction represent themselves and the company at the same time and thereby bind the corporation.

(6)  *Corporations.  Promoters.  "Bonus" Stock.  Ratification.*

The issue of "bonus" stock for services to be rendered cannot be sustained by the claim that as a corporation received the benefit of services rendered by the holders there was a ratification by the corporation of the agreement, where there was no vote either of the corporation or of the directors relating thereto nor any evidence of any ratification by the conduct of the corporation

Ratification of a contract by a corporation cannot be inferred in the absence of knowledge of the facts.

(7)  *Corporations.  Promoters.  Equity.  "Bonus" Stock.  Fraud.*

A claim to the benefit of the equitable principle that he who seeks equity must do equity, must itself be equitable and free from taint of fraud or other inequitable element and will not be upheld for the benefit of promoters of a corporation holding "bonus" stock who are respondents in a bill in equity brought by other stockholders against them, where their action in obtaining the stock was in contemplation of law a fraud upon the corporation and its stockholders.

(8)  *Corporations.  Stock.  Promoters.  "Bonus" Stock.*

Where treasury stock of a corporation was sold at par the measure of payment to promoters in bonus stock, is the value of the stock at par.

(9)  *Corporations.  Directors.  Gift of Stock.  Equity.*

The action of directors of a corporation in giving a block of stock without any recorded vote as a gift for past services was illegal and unauthorized and such stock is subject to surrender to the company in an action by other stockholders seeking such relief.

BILL IN EQUITY on facts fully stated in opinion.  Heard on appeal of one of respondents and of complainants. Appeal of respondent denied; appeals of complainants sustained and decrees appealed from reversed.

STEARNS, J.  These are three bills in equity brought by complainants, stockholders of Narragansett Cotton Mills, Incorporated, a Rhode Island corporation, hereinafter called the company, in behalf of complainants and other stockholders, to have certain shares of the capital stock of the

company now held by said respondents, returned to the company and cancelled on the ground that said stock was bonus or promotion stock, which was issued illegally without adequate consideration and without any valid vote or action of the corporation authorizing it. The company is made a respondent in each case, it having refused to continue the prosecution of similar suits heretofore brought against these individual respondents. Respondents have been temporarily enjoined from transferring or voting on their stock. By agreement the causes were heard together in the Superior Court and are in this court on appeals from the final decrees of the Superior Court.

The trial justice found in favor of the respondents and denied the prayer of complainants in the cases against Donovan and Hanson. In the case against Adolf E. Johnson he denied the prayer of the complainant for cancellation of 800 shares of stock issued at the time of organization of the corporation, but found that respondent Johnson should return 500 shares transferred to him at a later time.

The material facts are as follows: In March of 1917, one G. Joseph Nord and the respondents Donovan and Hanson planned together to promote a corporation for the manufacture of tire fabric. Nord had previously had experience in this line of business, Donovan was in the insurance business and Hanson in the real estate business. Nord claimed to have a contract with the Dayton Rubber Co. to buy tire fabric, also certain formulas for the manufacture of tire fabric and options for the purchase of machinery. The selection of a mill site was considered and investigation was made in regard thereto by Nord, Donovan and Hanson. It was finally decided to build the mill in Warwick and assurances were received from local officials that the new corporation when organized would be allowed a tax exemption for ten years, which assurance was later made effective by the town October 9, 1917, after the company was organized.

Respondent Adolf E. Johnson, who carried on a small machine business, first met these gentlemen early in August, 1917. He, with one Andrew E. Johnson (against whom a separate suit has been brought by these complainants, which is now pending), on August 23, 1917, made an agreement in writing with Nord, Donovan and Hanson in which it was stated to be the purpose of the parties to organize a new corporation with a capital stock of $200,000, divided into 20,000 shares of the par value of $10 each; Andrew E. Johnson and Adolf E. Johnson each agreed to subscribe for $2,000 of treasury stock and each was to receive as a bonus $8,000 par value of promotion stock. It was also agreed that $45,000 of promotion stock should be issued to Hanson, Nord and Donovan "as consideration for their services rendered to said corporation and the $19,000. remaining of the promotion stock to be issued to Claus Hanson to be used for purposes to be designated by the Board of Directors."

The following day (August 24) a certificate of incorporation of the company under the general laws, was issued based on the agreement of Andrew Johnson, Adolf Johnson and Claus Hanson to form a corporation, which had been previously filed with the Secretary of State. At once, on August 24, the three above-named incorporators held a meeting at the office of their attorney, adopted a set of by-laws and elected themselves as directors of the company. An hour later the three incorporators held a directors' meeting and elected Andrew E. Johnson, president, Claus Hanson, treasurer, and Adolf E. Johnson, secretary, of the company. On the company records it appears that the following communication to the company from G. J. Nord was then read to the directors: "I hereby offer you all my right, title and interest in any and all contracts and proposals for the furnishing of tire fabric and all information, options on machinery, tire yarns, plans, etc. All the foregoing I agree to turn over for 20,000 shares of the fully paid and non-assessable capital stock of your corporation—upon receipt of same I will execute and deliver a proper bill of.

sale. G. J. Nord." The three directors voted to accept this offer, and the president was authorized to receive the duly executed bill of sale, assignments, etc., and to cause to be issued to Nord in exchange thereof certificates of full paid and non-assessable stock to the amount of $200,000; the directors also passed a vote that said property was reasonably worth $200,000, was necessary for the purposes of the company and that the same be accepted in full payment of the entire capital stock of the company. It was also voted that Nord be appointed mill agent for one year at a salary of $30 per week until the mill shall be erected when his compensation should be increased; that Donovan be appointed fiscal agent of the company and that he be given the sale of 3,000 shares of the capital stock and receive as compensation therefor a commission of 25%. It further appears in the records of this meeting that Hanson, the treasurer, offered to serve without salary with the understanding that when the Board of Directors decided that the company was in such condition financially as to warrant it, the treasurer Hanson should then receive a sufficient salary and that the directors would vote the same to him. On September 1, 1917, 20,000 shares, the entire capital stock, were issued by stock certificate No. 1 to Nord, signed by Andrew Johnson, Prest. and Claus Hanson, Treas. On the same day on the back of this certificate a transfer of 12,000 of these shares was made by Nord to the treasurer of the company. Certificate No. 2 for 12,000 shares was immediately issued to the treasurer of the Narragansett Cotton Mills, Inc. Neither of these certificates was ever detached from the stock certificate book. By certificate No. 3, on September 1, a certificate for 8,000 shares was issued to Nord. September 5th, 6,500 shares of this stock was transferred by Nord to Andrew E. Johnson, Claus Hanson, James F. Donovan, Adolf E. Johnson and Claus Hanson, Trustee. On the same day, September 5th, by transfer from Nord, new certificates for 1,300 shares were issued to Andrew Johnson; 800 shares to Adolf Johnson; 1,500 shares

to Claus Hanson; 1,500 shares to James F. Donovan; 1,500 shares to G. Joseph Nord; 1,400 shares were issued for "bonus" to Claus Hanson, Trustee. 739 shares of this block of 1,400 shares was later by vote of a new board of directors, on December 17, 1918, returned to the treasury of the corporation. What disposition had been made of the balance of 661 shares does not appear from the testimony. Some of it was used as a bonus given to different people. From the treasury stock (the 12,000 shares above referred to) 200 shares were issued to Andrew Johnson. and 200 shares to Adolf Johnson for payments at par made therefor. Nord at this time had not made any transfer or assignment to the company. Some eight days later Nord, by a sealed instrument, executed as stated therein on the 13th day of September, 1917, "as of the date of September 5, 1917," sold and conveyed to the company all his right, title and interest in and to all contracts and proposals (both in existence and contemplation) for the equipment of a tire fabric mill, options on machinery, tire yarns and machinery plans, etc. The assets of the company at this time consisted of Nord's contract, formulas, etc., and $4,000 in cash out of which sum on October 3, 1917, by vote of the directors, $3,000 was paid for the mill site, and the promoters had taken for themselves 6,100 shares, more than three-tenths of the capital stock. In the Records of Directors of a meeting held November 14, 1917, there is an entry as follows: "The Treasurer reported that for the good of the Company the promoters, namely Claus Hanson, G. J. Nord and James F. Donovan, wished to donate to the treasury of the corporation 500 shares of company stock each." It was voted to accept these offers, and later the 1,500 shares were returned to the treasury. The respondents testify that in addition to the terms of the written agreement of August 23 it was at the same time orally agreed by all that the entire capital stock should first be issued to Nord and that 12,000 shares should then be returned by him to the company; Nord was to retain 8,000 shares to be distributed as follows:

1,500 shares each to Nord, Donovan and Hanson, 800 shares each to Andrew and Adolf Johnson, and the balance of 1,900 shares to be transferred to Hanson as trustee to be subject to the control of the directors for the benefit of the company. This was the plan which was executed. The 12,000 shares of treasury stock was thereafter sold to different individuals for cash, usually at par, and in some instances above par. These transactions between the promoters were never made known to any of the new stockholders who paid cash for their stock. The block of 8,000 shares was known as bonus stock and is the stock a part of which respondents now hold and for which no cash was ever paid. Donovan testifies that this stock was issued for services that had been rendered and for future services; Hanson says he got his stock to help get the concern going and to make it a success. Adolf Johnson that, "The agreement was that we were going to give our services and do all we could to promote the corporation." "We all came in equal and agreed to work for the corporation for what bonus stock we would receive;" that he received his bonus stock for services rendered outside of his duties as treasurer according to his agreement with Nord in the first place. Out of the 1,000 shares of bonus stock retained in each case by Hanson and Donovan, after each had returned 500 shares to the company treasury, Hanson now has 790 shares and Donovan has 528 shares.

The refusal of the corporation to continue the prosecution of its proceedings against these respondents is of the same effect as a refusal of the corporation to bring any proceedings. The proceedings in such case may properly be brought by stockholders for the benefit of the corporation.

Respondents' first claim is that the transfer to Nord for his contracts, etc., and the vote of the directors to issue all the capital stock therefor, was legal and that respondents as transferees of Nord's stock have good title thereto. But this claim is clearly untenable. Donovan testifies that at the time when the agreement of August 23 was made it was

decided on the advice of their attorney that the entire capital stock of 20,000 shares should first be issued to Nord. The vote of the directors on the next day to issue the 20,000 shares to Nord was a mere subterfuge and a blind. The issues of stock made to the promoters on September 5th were never authorized by vote of either directors or stockholders but were made in pursuance of the personal and secret agreement entered into between these promoters prior to the incorporation of the company. It is immaterial that the stock appeared to be transferred from Nord—it was really company stock that the promoters took and Nord was merely a conduit in the transaction. There is some evidence that Nord did have a contract with or some letters from the Dayton Rubber Co. of Dayton, Ohio, whereby that company agreed to take $630,000 worth of tire fabric provided this amount could be delivered in the year 1918. (2) This alleged contract and the formulas, etc., were not offered in evidence. Respondents say they were lost. But their disappearance has not been very satisfactorily accounted for. No use was ever made or attempted to be made of the contract or the formulas by the corporation. Adolf Johnson testifies that the formula was not important, that he never saw the contract but heard Nord read it. Donovan testifies that Nord had letters from the Dayton Co. in which they said they would take $630,000 worth of tire fabric. These valuable documents were left, it is claimed, in an unlocked office desk in envelopes and have never been seen by anyone since the organization of the company. No attempt has ever been made to secure a copy of the alleged contract from the Dayton Rubber Co. The essential element necessary for the construction of the mill and the success of the corporation was the procurement of cash from subscriptions of new stockholders, which it was the intention of the promoters to secure, from the very inception of the corporation, as is evidenced by the vote at the first meeting to authorize Donovan to sell 3,000 shares on commission of 25%. If the transaction with Nord as recorded in the

company records was made in good faith the company would not have had any stock to sell. The corporate record was not a true record of the actual proceedings of the directors; it was misleading and must have been intended to be so. This promoters' agreement was intended to be and in fact was kept secret from the purchasers of the 12,000 shares of treasury stock. Respondents seek to sustain this issue of stock to Nord on the authority of the case of *Old Dominion Copper Co.* v. *Lewisohn,* 210 U. S. 206; but the facts in the case at bar are quite different. The directors in this case voted to issue all of the capital stock for intangible property of no proven value and so far as can be judged from the evidence of no substantial value. The alleged contract was of no value unless a mill could be constructed with the capacity to turn out a large production in the year 1918. It is true that subsequently certain bobbins on which Nord had an option were bought by the corporation but as these were found to be unsuitable for the mill, they were authorized to be sold by the directors in December, 1917, for $200.

Respondents further claim the bonus stock was issued in payment of services rendered by them in promoting the corporation and to be rendered in the future after incorporation.

The trial justice found that the original issue to Nord was not made in accordance with the real agreement of the parties but that the bonus stock was issued to these promoters for services rendered in the past and to be rendered in the future to the corporation; that the respondents did render services to the corporation and that as stated in the rescript of the court, "considering the fact that the stock when it was given had no particular value and was wholly dependent upon the future success of the corporation, I do not feel able to say that it was so disproportionate to the services rendered that it ought to be cancelled."

In the first instance the validity of the contract on which respondents rely is to be tested as of the time when it was made. As the corporation was not in existence when the

contract was made it was incapable of making a contract (*Ireland* v. *Globe Milling & Reduction Co.*, 20 R. I. 190), and the promoters had no authority to bind the corporation by any contract made by or between them. No contract is implied in fact on the part of the corporation to pay for promoters' services. The promoters of a corporation hold a confidential and fiduciary relationship to the corporation and its stockholders. They are not precluded from dealing with the corporation, but any such transaction to be valid must be fair and fully disclosed to the corporation and the other stockholders. Neither the corporation nor the stockholders who do not assent will be bound by any agreement between the promoters and the directors of the corporation, if the directors are the promoters or persons jointly interested with them or under their control. The promoters in dealing with the corporation where it is intended to have other stockholders cannot in any transaction represent themselves and the corporation at the same time and thereby bind the corporation. *Erlanger* v. *New Sombrero Phosphate Co.*, 6 Eng. Ru. Ca. 777; *Old Dominion Copper Mining Co.* v. *Bigelow*, 203 Mass. 159; *Hayward* v. *Leeson*, 176 Mass. 310; *Yale Gas Stove Co.* v. *Wilcox*, 64 Conn. 101; (29 Atl. 303) *Macey Co.* v. *Macey*, 143 Mich. 138; *Pietsch* v. *Milbrath*, 123 Wisc. 647; *Bennett* v. *Havelock Light & Power Co.*, 21 Ont. L. R. 120.

As already pointed out the issue of the stock to these respondents was never authorized by any vote of the directors or stockholders; but even if such action had been taken it would not have been valid as to stockholders who later bought treasury stock. The agreement as to services to be rendered in the future was vague and indefinite in regard to the character and duration of the service and the corporation is not bound by such an agreement. It is claimed that as the corporation received the benefit of services rendered by respondents, there was a ratification by the corporation of the contract. But there is no vote either of the corporation or the directors relating thereto. Nor is there any evidence of any ratification by the conduct

of the corporation; on the contrary, such regular compensation as Nord and these respondents were to receive appears to have been made a matter of record in the company records. In March, 1918, the directors voted to pay Hanson, the Treasurer, twenty-five dollars a week thereafter. Hanson was finally removed as treasurer in the fall of 1918 on charges made of disloyalty to the company after a hearing before the board of directors. Although the mill was completed in October, 1918, by reason of the lack of funds it could not be started in operation until the fall of 1919. The understanding of the respondents as to their compensation was unknown to the new stockholders and upon the discovery of the secret agreement it was promptly repudiated. Ratification of a contract by the corporation can not be inferred in the absence of knowledge of the facts.

(7) The claim is made that as these are proceedings in equity, the corporation is bound, under the equitable principle, that he who seeks equity must do equity, to pay the fair value for services performed for and of benefit to the corporation. But as held in *Central Consumers' Wine & Liquor Co.* v. *Madden*, 68 Atl. 777 (N. J.), such a claim to the benefit of this equitable principle must be equitable and free from taint of fraud or other inequitable element.

(8) In the present cases the action of these promoters was in contemplation of law a fraud upon the corporation and its stockholders. The misleading entries in the corporate records in connection with other circumstances furnish strong evidence of an actual intention to practice a deception. If we assume that respondents were simply guilty of a technical fraud, we do not think their services, although of some value to the corporation, are of sufficient value to entitle respondents to retain the stock. The trial justice based his findings in favor of respondents on the fact that the stock when taken by the promoters had no particular value. We think the fair rule in the circumstances is that as payment was taken in stock the promoters can not ask to be placed in a better position than other stockholders who paid par for their stock and that the measure of pay-

ment to the promoters in the bonus stock is the value of the stock at par. All of the respondents were authorized to sell and sold stock and received commissions on sales made. Donovan received $17,000 in commissions; Adolf Johnson, as appears from the Auditor's Report received $1,400. Hanson has disposed of 210 shares of his stock and Donovan has disposed of 472 shares of his stock. Without going into further details we think the respondents are not entitled to any further allowance for services in these proceedings and that such shares of the bonus stock as are now held by each respondent should be delivered to the corporation and cancelled according to the prayers of the complainants.

Adolf Johnson has appealed from that part of the final decree whereby it is ordered that he shall surrender for cancellation 500 shares of bonus stock (certificate No. 46). From the stub of the stock certificate books the date of this certificate is entered September 5, 1917. The next issue preceding this was October 11, 1917, and the following issue was October 23, 1917, each of these latter issues being from treasury stock whereas Certificate No. 46 was transferred from Certificate No. 35 which was for 1,400 shares of bonus stock held by Claus Hanson, Trustee. This block of stock was issued and given to Johnson by the directors without any recorded vote as a gift for past services. This action of the directors was unauthorized and illegal and this stock must be surrendered to the corporation.

The appeal of Adolf Johnson to this part of the final decree is denied and dismissed and the decree of the Superior Court in this respect is affirmed. In other respects the appeals of the complainants are sustained and the decrees appealed from are reversed.

The parties may prepare forms of decrees in accordance with our conclusions stated herein and present the same to this court for allowance.

*Cushing, Carroll & McCartin, Comstock & Canning,* for complainants.

*McGovern & Slattery, Swan, Keeney & Smith, William H. McSoley,* for respondents.