[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed August 13, 1997
In this matter PCNet has filed a motion for contempt against Advanced Corporate Networking, Inc. (ACN) and an employee, Maureen Vizarry, claiming they violated the terms of an injunction issued by the court. A hearing was held on the motion. The court will now discuss the relevant facts and background.
The plaintiff PCNet, Inc., is a so-called value added reseller of computer products and sells computer hardware, software, and services. Advanced Corporate Networking, Inc., one of the defendants, is a rival of PCNet in what is a very competitive and expanding market. From the testimony presented by Mr. Gutkin, an employee of PCNet and Ms. Vizarry an employee of ACN, who is also a defendant, it is apparent that this is the type of business where personal contacts and relationships between sales representatives and customers are important.
In any event, PCNet had several of its employees sign so-called non-compete agreements when they began work for that company. For a period of two years after leaving the employment of PCNet, they were not to compete with the company, solicit other employees to leave PCNet, not disclose or use certain proprietary and confidential information, and were to return contracts and customer information developed by and on behalf of PCNet upon leaving its employment: also, customer lists were to be returned to PCNet and would be considered PCNet customers under certain circumstances. Ms. Vizarry when she became an employee of PCNet signed one of these agreements.
Three employees, including Ms. Vizarry, who signed these agreements left their employment with PCNet and began employment with Advance Corporate Networking, Inc (ACN). PCNet then came to believe that each of these employees violated the terms of their employment and confidentiality agreement. Suit was brought against the former employees and ACN which PCNet claims CT Page 12605 encouraged and induced the employees to violate their agreement. Various legal theories were set forth and claims of damage to PCNet were alleged.
On October 28, 1996 PCNet, ACN and the individual defendants came to an agreement concerning PCNet's request for a permanent injunction and pursuant to that agreement an order was entered. The part of the order relevant to the proceedings on this motion for contempt provided that:
 (iii) neither they nor their agents, servants, employees or those in active concert or privity with them (collectively for the purpose of this clause (iii), the "ACN Parties"), will call on, contact, sell or otherwise market to and/or receive any business from the following customers of PCNet, Inc. for one year from the date of this Order; except that such prohibition in respect of the following customers of PCNet shall not prevent ACN Parties from continuing the business between ACN and such customers as is in existence on October 25, 1996, such business being hereby expressly limited to the type of products and/or services sold to such customers by the ACN Parties on or prior to said date and further limited to engaging in such business with the actual customer facility of such customer to which such products and services, as the case may be, have been sold by the ACN Parties prior to said date:
Duracell
Playtex
Tambrands
(a)
The question before the court is whether the motion for contempt should be granted based on a violation of the above quoted portion of the order as applied to Duracell.
At the hearing on the motion for contempt, the evidence established that prior to the entry of the order, ACN sold a CT Page 12606 piece of equipment called a server to Duracell for use at its Bethel, Connecticut facility; it had also sold various so-called software products to Duracell for use at this facility. Prior to the entry of the order, ACN did not sell a server or software to Duracell for use at its Lexington, North Carolina facility although it sold various other products for use at that facility.
However, after the order was entered, ACN did in fact sell servers and software to Duracell for use at its Lexington, North Carolina facility. The plaintiff claims that sale of the servers and software to Duracell for use at its Lexington facility violated the court's order. This necessarily involves an interpretation of the court's order which has been quoted above. It is important to note that the court order is a verbatim rendition of the so-called "Mutual Release and Settlement Agreement at paragraph 2(iii) of that agreement. Therefore, the court order was entered as a result of and to give court sanction to an agreement worked out between the parties after the commencement of litigation by PCNet and prior to a hearing on a request for an injunction.
In other words, the defendant is quite correct in its reference to cases like Jenks v. Jenks, 39 Conn. App. 139, 142
(1995), which holds that contempt must be willful and because of its harsh nature must be founded "solely upon some clear and express direction of the court." As an earlier case said, punishment for civil contempt "should not rest upon implication or conjecture but the language declaring such rights should be clear, or imposing burdens specific and unequivocal so that the parties may not be misled thereby." Blaydes v. Blaydes,187 Conn. 464, 468 (1982).
Having said all that, however, since the court was putting into the form of an order that which the parties had agreed to, ordinary principles of contract interpretation are of some relevance. In other words, we have here an agreement between sophisticated business people well aware of their niche in a competitive market place represented by experienced business lawyers — the agreement ought to be given that meaning then that parties in such circumstances would have given it and the fact that it was put into a court order should not be allowed to dilute its meaning or its intended effectiveness. Any other view would discourage parties from working out agreements prior to hearings when injunctive relief is sought. Besides the court cannot ascertain the nature of the analytical tightrope it would CT Page 12607 have to walk when it enters an order based on the agreement of the parties if upon an alleged violation of that order it had to make a distinction between what the parties can be held to have agreed to and how clear an order must be before a party allegedly violating it can be held in contempt. Some general rules from the Restatement (Second) Contracts which are fully supported by Connecticut case law must be kept in mind.
§ 202 Rules in Aid of Interpretation
 (1) Words and other conduct are interpreted in the light of all the circumstances and if the principal purpose of the parties is ascertainable it is given great weight.
 (2) a writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.
As to "circumstances" in comment (b) the Restatement says: "In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in a position they occupied at the time the contract was made. When the parties have adopted a writing as a final expression of their agreement, interpretation is directed to the meaning of that writing in light of the circumstances." Connecticut cases have used the following language: "In arriving at the intent of the parties to a contract as expressed or implied in the language used by them, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction and every part of the writing should be considered with the help of that evidence," Shaw v. Pope, 206, 209 (1907), quoted in Foley v.Huntington Co., 42 Conn. App. 712, 730 (1996), and Leventhal v.Stratford, 121 Conn. 290, 296 (1936).
As to the principle of examining a writing as a whole comment (d) of the Restatement says: "Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph. A longer writing similarly affects the paragraph, other related writings affect the particular writing, and the circumstances affect the whole. Where the whole can be read to give significance to each part, that reading is preferred: if such a reading would be unreasonable, a choice must be made." This is in conformity with Section 203 of the Restatement CT Page 12608 which says that: "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms of an agreement is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Cf Hatko Corporation v. Della Pietra,195 Conn. 18, 20 (1985). Judd v. Mutual Bank Trust Company,114 Conn. 553, 557 (1932).
Keeping these general principles in mind at least as a reference point the court does find that there has been a violation of a court order and that a civil contempt has been established. To the court the language of the order is quite clear.
If the defendant's position were correct the language of the agreement later entered as a court order could have merely said:
 Such prohibition in respect of the following customers of PCNet (including Duracell) shall not prevent the ACN parties from continuing the business between ACN and such customers as in existence on October 25, 1996, such business being hereby expressly limited to the type of products and/or services sold to such customers by the ACN parties on or prior to said date.
The following language would have been completely superfluous and/or redundant if the defendant's position is accepted:
 . . . and further limited to engaging in such business with the actual customer facility of such customer in which such products and services as the case may be, have been sold by the ACN parties prior to said date . . .
Furthermore, for the defendant's interpretation to be correct "facility" would have to be treated as potentially plural, i.e. "facility or facilities."
The defendant's response to this is to say the plaintiffs position would require "radical linguistic surgery" since its construction would require the clause in question to read as follows with the necessary added language underlined:
 . . . such prohibition in respect of the following customers of PCNet [including Duracell] shall not CT Page 12609 prevent the ACN Parties from continuing the business between ACN and such customers as is in existence on October 25, 1996, such business being hereby expressly limited to the type of products and/or services sold to such customers by the ACN Parties on or prior to said date and further limited to engaging in such business with he actual customer facility [such business being limited to the type of products and/or services sold to that particular customer facility prior to that date] of such customer in which such products and services, as the case may be, have been sold by the ACN Parties prior to said date . . . [Additional language emphasized.]
The defendant comes to this conclusion by examining in isolation the phrase "such business being hereby expressly limited to the types of products and/or services sold to such customers" and noting that the phrase "such business" is defined in terms of the customer. Only then is language added talking in terms of a "customer facility." But the "such business" phrase cannot be read out of context but must be read with the "customer facility" language. Read together "such business" is defined in terms of and in the context of dealing with a "customer facility" if this was not so why add the phrase which includes "customer facility" at all.
Besides given the circumstances of these parties, the underlying nature of the dispute and the danger perceived by PCNet to its interests presented by these ex-employees going to work for its rival in a customer relationship sales industry, what could the parties have possibly meant other than the construction now given by the plaintiff?
(b)
Before considering the appropriate remedy for the finding of civil contempt, a defense of "unclean hands" raised by the defendant must be considered by the court.
When the parties entered into their above referenced agreement, part of which was made a court order, a section of that agreement contained a confidentiality provision. A copy of the entire agreement, including provisions covered by the confidentiality order, was attached to the plaintiff's CT Page 12610 preliminary memorandum filed in this contempt action. This was gratuitous. The court had no need to examine the whole agreement and filing the agreement did potentially open up the document to inspection by the public at large in violation of the confidentiality agreement.
But despite this, the court concludes that this is not an appropriate occasion for application of the "unclean hands" doctrine as a defense to these equitable proceedings. Connecticut appears to accept the "narrow formula" of the unclean hands doctrine as set forth in Dobbs, Law of Remedies, Vol. 1, § 2.4(2). Thus, in Yale Gas Co. v. Wilcox, 64 Conn. 101, 128
(1894), the court says:
 Though an obligation be indirectly connected with an illegal transaction, it will not thereby be barred from enforcement if the plaintiff does not require the aid of the illegal transaction to make out his (sic) case.
Cf. Samasko v. Davis, 135 Conn. 377, 383 (1949).
In Gest v. Gest, 117 Conn. 289, 296 (1933), the court says if a claim "grows out of or depends upon or is inseparably connected with [that party's] own prior fraud, a court of equity will, in general, deny [the party] any relief, and will leave [the party] to whatever defenses at law [the party] might have." Also seeForestiere v. Doyle, 30 Conn. Sup. 284, 286 (1973); cf. ChauvinInternational Ltd. v. Goldwitz, 927 F. Sup. 40 (D. Conn., 1996).
In S.E.C. v. Electronic Warehouse, Inc., 689 F. Sup. 53 (D. Conn., 1988), the court held that the defenses of unclean hands and inequitable conduct apply only where there is a direct nexus between the misconduct and the right which is the basis of the suit; conduct which occurs during litigation of the lawsuit rather than the accrual of the action cannot perform the basis of an equitable defense.
The plaintiff appears to concede that this limitation of the unclean hands doctrine applies in our state but then says that none of the cases deal with the precise factual situation presented here — "a plaintiff who has breached the agreement relied upon as a basis for recovery," page 16 of 8/4/97 brief. But that misses the whole point of the cases — here the claimed contempt and the alleged acts that constitute it are CT Page 12611 based on a discreet portion of the agreement between the parties that have nothing to do with the confidentiality provisions of the agreement.
The reason for the limitation on the doctrine is that, too broadly applied, it is unwieldy and can be unfair. Trial judges shouldn't have wandering warrants to correct all the wrongs of the world whether or not they have anything to do with the litigation before it. Why should a party who has been wronged be prevented from moving to remedy that wrong merely because it has itself done a wrongful act completely unrelated to the claim it makes? If PCNet has violated confidentiality provisions, then it can be separately proceeded against for having done so but it does not appeal equitable to the court to also give carte blanche to excuse any unrelated wrong committed against PCNet. This is especially so where the alleged wrongful conduct relied on for the unclean hands defense arises after litigation has commenced in the original action — there would be no end to the disputes and bickering, all of which would have nothing to do with the dispute at hand.
In any event, as said in Cohen v. Cohen, 182 Conn. 193, 204
(1980),
 The application of the equitable maxim [of unclean hands] rests in the sound discretion of the trial court and generally should not be employed to insulate the party who asserts it from the consequences of his (sic) own wrongdoing . . . This is especially so where the consequence of denying equitable relief would be to visit upon the party seeking it a forfeiture of extreme proportion.
It does not seem appropriate to deprive the plaintiff of its right to relief for a mistake that appears to have been completely inadvertent, not calculated to help the plaintiff in securing any remedy or advantage and capable of being in large part remedied by a simple motion (not yet filed) requesting the court to seal that portion of the plaintiffs memorandum containing the agreement.
(c)
The court finds that ACN and Ms. Vizarry, individually and in her capacity as agent of ACN, are in contempt of the court's CT Page 12612 preliminary and permanent injunction.
(i.)
The plaintiff requests that the defendants be ordered to pay a per diem fine until such time as the continuing business in violation of the injunction is discontinued.
In criminal contempt, fines are absolute, payable on being imposed and usually ordered to be made payable to the state since a public right is being vindicated. However, "contempt is civil when the fine is conditional and coercive and when the contemnor [that's the person held in contempt] can obtain release from the sanction by compliance with the judicial decree." McTigue v. NewLondon Education Assoc., 164 Conn. 348, 353 (1973); U.S. v.United Mine Workers, 330 U.S. 258, 331, 332.
There is no indication that the defendants violated the order in any other way than by making the particular sales to the North Carolina Duracel facility which are the subject of this action. Even if the plaintiffs position is accepted that the defendants tried to conceal the sale made here — a construction not necessarily dictated by the facts — that is no indication that other violations have, are or will occur. Apart from the situation where there is actual evidence of ongoing violations and even in that situation perhaps, a civil fine cannot be punitive but can only be "coercive in that it should assure compliance with the . . . [court's] order." School Committee v.Pawtucket Teacher's Alliance, 221 A.2d 306, 331 (RI), quoted with approval in McTigue at 164 Conn. page 353. In Dobbs at Vol. I, § 2.4(2), the writer suggests conditional fines may be imposed, that is, where a violation is found, the court can impose a fine and suspend it, the fine would only be imposed if a future violation of the court's order is proven. That was the procedure followed by the trial judge in the Pawtucket TeachersAlliance case.
That is what the court will do here. In light of the violation and keeping in mind the amount of profit to be made by the sale of the items involved in this case, the court will impose a conditional fine of $12,000. This fine will accrue and be payable to the plaintiff if and only if any violations of the court order are shown to have occurred subsequent to the date of this order. The purpose of this conditional fine is meant to be coercive only; its purpose is, in light of the past violation of CT Page 12613 the court order, to try to ensure that the court's order is obeyed from the date of this decision. Such remedy would of course not preclude any order for compensatory damages and reasonable attorneys fees that might be appropriate if any future violation is established.
(ii.)
Another possible sanction for civil contempt is purely compensatory. A civil contempt fine may be imposed "for losses sustained," "such fine must of course be based upon evidence of complainant's actual loss," "such a `compensatory fine' must necessarily be limited to the actual damages suffered by the injured party as a result of the violation of the injunction."DeMartino v. Monroe Little League, 192 Conn. 271, 278-79 (1984).
In this case, the plaintiff makes a claim for lost profits. The total cost of the file server system ACN sold to Duracel's North Carolina facility was $64,064. The cost of the software sold was $3393 for a total cost of $67,457. PCNet claims a percentage of the total cost of these items equal to its profit margin; the profit margin on these products was testified as being ten percent. Thus, the claim is for $6,745.70 as compensatory damages.
The defendants object, citing DeMartino, supra, and Robert S.Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525 (1988). In the latter case, the trial court found that the individual defendant, a former employee of the plaintiff, had breached valid restrictive covenants — he did business with plaintiff's former customers but also with new customers in the geographic area defined in the agreement. The trial court refused to award damages regarding violations after a certain date, 1984, because there was "no credible evidence that the plaintiffs customers would have renewed their accounts after 1984 and denied damages for the period following 1984." Id. page 540.
The Supreme Court, in upholding the trial court, said at page 542-43:
 The proper measure of damages for breach of a covenant not to compete is the nonbreaching party's losses rather than the breaching party's gains . . . The plaintiff seeks to establish its lost profits by reference to the undisputed fact CT Page 12614 that Wiederlight sold commercial insurance to customers in the restricted area during the covenant's operation. To permit the plaintiff to recover damages merely by proving that the defendant breached the covenant, however, would ignore the well-established rule that damages are essential to the plaintiffs proof and must be shown with reasonable clarity.
But the point is that the defendant in the Weiss case left the plaintiffs employment in March of 1983 and the trial court did award damages for 1983 and 1984. The Supreme Court, in upholding the trial court's decision denying post-1984 damages, noted that the plaintiffs principal, Mr. Weiss, did not know the extent of the plaintiffs contacts with these accounts subsequent to the defendant leaving the plaintiffs employment. The case now before the court is not controlled by Weiss and is more like VanDyck Printing Co. v. DiNicola, 43 Conn. Sup. 191, 200-01 (1993). In that case, there was damage to the plaintiffs profit prospects with active customers. Here at the time the order was entered and when ACN made its inappropriate sales, PCNet was ready, willing and able to sell the very items sold by ACN to the Lexington, North Carolina plant.
Mr. Gutkin is a sales representative of PCNet. He was the person who discovered the inappropriate sales made by ACN to Duracel's North Carolina plant. He visited the Lexington plant for the very purpose of introducing himself as the new PCNet account executive assigned to that facility — the only purpose in doing so was to develop a relationship with Duracel's Brian Murphy who acts as a purchaser of the type of equipment involved in this case. The purpose of the visit was to procure sales to Duracel at the Lexington plant. PCNet had done business with this plant and was still trying to do such business. The ACN sales to the Lexington facility occurred within three months of the court's October 28, 1996 order. Under these circumstances, it seems fair to award $6,745.70 to PCNet by way of compensation for its lost sales opportunity.
(iii.)
Section 52-256b(a) of the General Statutes provides that when a finding of civil contempt is made "the court may award to the petitioner a reasonable attorneys fee and the fees of the officer serving the contempt citation, such sums to be paid by the person CT Page 12615 found to be in contempt." Such an award is discretionary, not mandatory.
In this case, an affidavit has been submitted by counsel for the plaintiff requesting an award of attorneys fees in the amount of $33,190.50. Counsel state in the affidavit submitted that they have put in 220.75 hours on this case and list in detail the time spent by each lawyer and for what purpose. The court has no doubt at all that all the information in the affidavit and bills is accurate. The court does not question the hourly fees charged by counsel.
However, the court must make its own determination of what reasonable fees should be and it must do so based on what is fair to all sides. The lawyers involved in this case are highly skilled specialists. But it is also true that any lawyer faced with litigation of any serious proportions is capable of devoting almost unlimited hours to a case, far beyond what in a more realistic world should be spent. No personal criticism is meant; the court itself can be accused of this failing — look at the length of this opinion and some others that the court has written. The point is, the court cannot automatically accept any billing submitted as a reasonable fee despite the fact that it believes, as here, that the hourly rates are reasonable and the claimed work was done. Two hearings were held on this matter on separate days consuming between four to six hours. Three briefs were filed by counsel for the plaintiff. Some preliminary discovery was done but the issue presented by the motion for contempt did not present complicated issues of law or fact — the wrongdoing was readily discovered on a previously scheduled visit by a sales representative of the plaintiff. The defendant always took the position that it made the sales it was accused of but said this action did not violate the order. Thus, no lengthy investigative process was required to establish the factual basis of the plaintiffs claim.
Under all the circumstances, the court will award costs and attorneys fees in the amount of $12,000.[1]
The court's order is that
 1. A conditional fine of $12,000 is imposed but suspended and only to be imposed upon further proven violation of the court's order.
CT Page 12616
 2. Compensatory damages in the amount of $6,740.70.
 3. Attorneys fees in the amount of $12,000 and costs as authorized by statute.
Corradino, J.